740 A.2d 198

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Kelly O'DONNELL, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 20, 1997.

Decided Oct. 28, 1999.

Robert Brett Dunham, Philadelphia, for K. O'Donnell.

Catherine Marshall, Karen A. Brancheau, Philadelphia, for the Com.

Robert A. Graci, Harrisburg, for Atty. General's Office.

Before FLAHERTY, C.J., and ZAPPALA, CAPPY, CASTILLE, NIGRO and NEWMAN, JJ.

*OPINION*

NIGRO, Justice.

Following a four day bench trial, Appellant Kelly O'Donnell and her co-defendant, William Gribble, were found guilty of first degree murder for the death of Eleftherios Eleftheriou. Appellant was also convicted of criminal conspiracy, robbery, and related offenses. On July 1, 1993, following a bench penalty-phase hearing, the trial court found one aggravating factor and three mitigating circumstances, and sentenced Appellant to death.[1] The trial court denied Appellant's post-verdict motions and formally imposed the sentence of death on August 11, 1994. This direct appeal followed. For the reasons discussed below, we affirm Appellant's convictions but reverse the judgment of sentence imposed by the trial court and remand for a new penalty phase hearing.

Although Appellant does not challenge the sufficiency of the evidence, this Court is required in capital cases to review the record to determine whether the Commonwealth has established the elements necessary to sustain a conviction for first-degree murder. *Commonwealth v. Washington*, 547 Pa. 550, 553, 692 A.2d 1018, 1019 (1997), *cert. denied*, 523 U.S. 1123, 118 S.Ct. 1806, 140 L.Ed.2d 945 (1998). In conducting such a review, we must view the evidence, and all reasonable inferences drawn therefrom, in the light most favorable to the Commonwealth as verdict winner and determine whether the fact-finder could find every element of the crime beyond a reasonable doubt. *Id.*

Viewed under this standard, the evidence presented at trial establishes that in early November of 1992, Appellant and her boyfriend, William Gribble, were staying in an apartment at 3123 Richmond Street in Philadelphia. The apartment belonged to Agnes McClinchey, Gribble's mother, who had

---

1. The aggravating factor was that Appellant committed the killing while in the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6). The mitigating circumstances were that Appellant had no significant history of prior criminal convictions, 42 Pa.C.S. § 9711(e)(1), that she was the mother of six children, 42 Pa.C.S. § 9711(e)(8), and that she was a drug user, 42 Pa.C.S. § 9711(e)(8).

given Appellant and Gribble permission to stay there while she went to visit a Mr. Ed Paduski. James Mathews, an elderly friend of McClinchey's, also resided in the apartment.

On November 11, 1992, at approximately 10:30 p.m., Appellant went to a pizza shop managed by Mr. Eleftheriou, carrying a leather jacket which she offered as collateral for a loan she sought from Mr. Eleftheriou. An employee of the pizza shop observed Mr. Eleftheriou remove a large roll of money from his pocket and give Appellant some money. Appellant and Mr. Eleftheriou then made arrangements to meet later that evening. After closing the pizza shop at approximately 1:00 a.m. on November 12, 1992, Mr. Eleftheriou left in his car to meet Appellant.

In a confession later given to police, and admitted at trial, Appellant stated that at approximately 1:30 a.m. on November 12, 1992, she met with Mr. Eleftheriou and brought him back to the apartment at 3123 Richmond Street. When Mr. Eleftheriou was looking out a window, Appellant admitted that she struck him in the head with a hammer. After Mr. Eleftheriou fell to the floor, Appellant stated that she continued to beat him with the hammer. Appellant claimed that she was motivated to kill Mr. Eleftheriou because he was a "pervert" and had previously sexually assaulted her. Shortly after beating him, Appellant stated that she took Mr. Eleftheriou's body to the basement, dismembered the body with a hacksaw, and put the body parts in trash bags. She also admitted that she cut off Mr. Eleftheriou's penis and placed it in a pencil case with the intention of sending it to her father. In her statement, Appellant alleged that she beat and dismembered Mr. Eleftheriou without Gribble's help or knowledge. However, Appellant maintained that Gribble did help her with disposing the trash bags containing the body parts and stated that she and Gribble dumped the trash bags along Delaware Avenue at some point on November 12, 1992. Later that same evening, Appellant admitted that she and Gribble used Mr. Eleftheriou's car and credit card to go shopping.[2]

2. After his arrest, Gribble also confessed to the murder of Mr. Eleftheriou. Gribble's version of the murder, however, differed from Appel-

On the morning of November 13, 1992, Philadelphia police received a report that someone had found body parts in a trash dump on North Delaware Avenue. The responding officers found the severed arms of a white male, a human torso with its head missing and a head with the left eye removed. These body parts were later identified as belonging to Mr. Eleftheriou. Among papers strewn around the site, police found a letter addressed to Agnes McClinchey, 3123 Richmond Street.

Later on November 13, 1992, Agnes McClinchey returned to her apartment, finding blood on her front door and on the carpet. Appellant told Ms. McClinchey that she and Gribble had "been involved in a murder" and that she had heard a report that the victim's head had been found on Delaware Avenue. Ms. McClinchey also overheard Appellant tell Gribble to burn Mr. Eleftheriou's car. When Gribble returned from doing so, Appellant said to him "thank God you didn't get caught." At approximately 7:30 p.m. on November 13, 1992, police responded to a report of a car on fire on D Street. After the fire was extinguished, police found body parts in the inside of the car, later identified as belonging to Mr. Eleftheriou.

Ms. McClinchey subsequently called the police. After interviewing Ms. McClinchey at a near-by gas station, police went to her apartment and arrested Appellant and Gribble at approximately 1:30 a.m. on the morning of November 14, 1992. A search of the basement revealed a kitchen knife, a chisel, and a claw hammer, each containing traces of human tissue and blood. Stuffed inside a pipe, police also found a pencil case containing a human eyeball and penis. During questioning at the police station, Appellant and Gribble each gave their

lant's. In his statement, which was also admitted at trial, Gribble claimed that he arrived at the apartment at approximately 2:00 a.m. and saw Eleftheriou and Appellant on the couch together. Gribble stated that Eleftheriou was "feeling [Appellant] all over." In response, Gribble stated that he hit Mr. Eleftheriou on the head with a hammer about ten to fifteen times. Gribble claimed that Appellant left the house and Gribble dismembered the body. According to Gribble's statement, he bagged the body parts and eventually dumped some of the bagged body parts along Delaware Avenue.

separate statements accepting personal responsibility for the murder while attempting to exculpate the other. Appellant and Gribble were each charged with murder, robbery, arson, and a variety of related offenses in connection with the killing of Mr. Eleftheriou.

Appellant and Gribble were tried jointly. Both waived their right to a jury trial and agreed to be tried before the trial judge. At the bench trial, an assistant medical examiner testified that there were numerous abrasions on Mr. Eleftheriou's head that were consistent with blows from a hammer. He further testified that one person could not have killed and dismembered the victim in a manner consistent with the physical evidence. According to the medical examiner, red abrasions in the areas where the victim's head and right arm had been severed indicated that his heart was still beating when these body parts were removed. In contrast, yellow abrasions in the areas where the remaining body parts had been severed indicated that the victim's heart had stopped beating by the time those parts were severed. The medical examiner testified that one person working alone would not have been able to remove both the head and the right arm in the estimated fifteen minutes it took before the victim bled to death. After hearing the evidence presented at trial, the trial judge convicted Appellant on all counts, including murder in the first degree, 18 Pa.C.S. § 2502(a).[3]

■ To obtain a conviction for first-degree murder, the Commonwealth must prove that a human being was unlawfully killed, that the defendant did the killing, that the killing was done with deliberation, and that the defendant acted with a specific intent to kill. *See* 18 Pa.C.S. § 2502(a), (d) (1983); *Commonwealth v. Rios*, 546 Pa. 271, 281, 684 A.2d 1025, 1036 (1996), *cert. denied*, 520 U.S. 1231, 117 S.Ct. 1825, 137 L.Ed.2d

---

**3.** Appellant was also convicted of criminal conspiracy, 18 Pa.C.S. § 903; possessing an instrument of crime, 18 Pa.C.S. § 907(a); robbery, 18 Pa.C.S. § 3701; theft by unlawful taking, 18 Pa.C.S. § 3921; unauthorized use of an automobile, 18 Pa.C.S. § 3928; arson, 18 Pa.C.S. § 3301; risking a catastrophe, 18 Pa.C.S. § 3302(b); forgery, 18 Pa.C.S. § 4101; abuse of a corpse, 18 Pa.C.S. § 5510; and credit card fraud, 18 Pa.C.S. § 4106.

1032 (1997). This specific intent to kill may be proven by circumstantial evidence, which may consist of the defendant's use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Bond*, 539 Pa. 299, 305, 652 A.2d 308, 311 (1995).

We agree with the trial court that the evidence presented at trial was sufficient to support a conviction of first degree murder. Using a hammer to repeatedly smash a human being's skull undoubtedly supports a finding that a deadly weapon was used on a vital part of the victim's body and permits an inference of a specific intent to kill. *See Commonwealth v. Marshall*, 534 Pa. 488, 500, 633 A.2d 1100, 1106 (1993) (use of hammer on head of victim was sufficient to demonstrate specific intent to kill). Further, based upon our independent review of the record, we are satisfied that sufficient evidence was produced at trial from which the fact finder could have found each element of an intentional killing beyond a reasonable doubt. *See* 18 Pa.C.S. § 2502(a), (d) (1983).[4]

**4.** Although Gribble stated in his confession that he beat and dismembered Mr. Eleftheriou, and Appellant claimed in her confession that she had committed these acts, the record sufficiently supports the trial court's finding that both Appellant and Gribble participated in robbing, beating and dismembering Mr. Eleftheriou. *See Commonwealth v. Pierce*, 446 Pa. 479, 483, 288 A.2d 807, 809 (1972) (conflict in evidence does not render evidence insufficient because it is within province of fact finder to determine weight to be given to testimony). The trial court found that it had been presented with sufficient evidence of a premeditated plan to lure Mr. Eleftheriou to the apartment, to rob him and to murder him by smashing his skull with a hammer. First, Appellant noticed that Mr. Eleftheriou was carrying a large roll of cash while at Mr. Eleftheriou's store on the evening of the murder. Testimony from Ms. McClinchey revealed that the tools, determined to be the murder weapons, were normally kept in the basement. Since the hammer was already in the living room when Mr. Eleftheriou was first attacked with it, the trial court concluded that this fact supported the Commonwealth's theory that the tools had been placed in the living room in anticipation of the attack upon Mr. Eleftheriou. Moreover, the medical examiner testified that, given the physical evidence, the dismemberment of Mr. Eleftheriou's body would have required more than one person. Further, following the killing, Gribble and Appellant stole and used Mr. Eleftheriou's credit card to purchase some items. Viewed in the light most favorable to the Commonwealth, this evidence is sufficient to support the inference that Gribble and O'Donnell formed a

Following the verdict, the court accepted defense counsel's assertion that Appellant wished to waive her right to a jury trial for the penalty phase. Following the sentencing hearing, the trial judge concluded that the one aggravating circumstance it found outweighed the three mitigating factors also found, and sentenced Appellant to death. After the court advised Appellant of her post-trial rights, defense counsel requested the appointment of replacement counsel. New appellate counsel was retained, who represented Appellant on post-verdict motions, which were denied by the trial court on August 11, 1994. Appellate counsel then filed a brief and conducted oral argument on Appellant's direct appeal to this Court. Finding the brief and argument to be inadequate to allow for proper review, this Court issued an order on July 31, 1996, giving Appellant the choice of retaining new counsel, requesting the appointment of new counsel, or proceeding with her current appellate counsel, despite the inadequacies. Following the issuance of this order, the Center for Legal Education, Advocacy and Defense Assistance was contacted and entered its appearance on behalf of Appellant. New appellate counsel filed its own brief, which is now before this Court.

In her lengthy brief, Appellant raises fourteen issues, many with subissues. As Appellant concedes, the majority of these issues were not raised below and instead, are raised for the first time in this direct appeal. Appellant argues that, in light of this Court's practice of relaxing waiver rules in capital cases, her claims must nonetheless be reviewed by this Court on their merits.

■ In *Commonwealth v. Zettlemoyer*, this Court observed that it is the practice of this Court to relax our waiver rules in death penalty cases because of the irrevocable and final nature of the death penalty. *Zettlemoyer*, 500 Pa. 16, 50 n. 19, 454 A.2d 937, 955, n. 19 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). As such, we stated that "significant issues perceived sua sponte by this Court, or raised by the parties, will be addressed and, *if possible from the record,*

premeditated plan to rob and kill Mr. Eleftheriou. *Accord Commonwealth v. Gribble,* 550 Pa. 62, 73–75, 703 A.2d 426, 432 (1997).

resolved." *Id.* (emphasis added). This relaxed waiver doctrine, however, was never meant to serve as an invitation to appellate counsel to appear before this Court carte blanche and expect that we will resolve a litany of newly developed challenges not raised or objected to before the lower court. Clearly, such a practice would undermine the process of meaningful appellate review, which is fundamentally based on the official record of what happened at trial. *See Capital Cities Media, Inc. v. Toole,* 506 Pa. 12, 22, 483 A.2d 1339, 1344 (1984) (preservation of issues in the lower courts is essential to meaningful appellate review). Nonetheless, under the circumstances of this case, we have addressed the merits of Appellant's claims, despite any technical waiver. We do so either because the record provides an adequate basis to resolve the merits of the claim, *see Commonwealth v. Brown,* 551 Pa. 465, 711 A.2d 444, 456 (1998) (although waived, claim was considered on the merits since record allowed for such review) or because Appellant, who is represented by substituted counsel in this direct appeal, has framed the issues as instances of prior counsel's ineffectiveness, *see Commonwealth v. Pizzo,* 529 Pa. 155, 157, 602 A.2d 823, 824 (1992) (issue of counsel's ineffectiveness is properly raised before this Court when it is the first available opportunity new counsel has had to raise claims of prior counsel's ineffectiveness).

### A. Claims of Ineffectiveness at the Suppression Hearing / Guilt Phase of Appellant's Trial

The three prong test under which claims of ineffective assistance of counsel are to be reviewed when presented on direct appeal is well settled. To prevail on such a claim, Appellant must demonstrate (1) that the underlying claim is of arguable merit; (2) that counsel's course of conduct was without a reasonable basis designed to effectuate his client's interest; and (3) that he was prejudiced by counsel's ineffectiveness. *See Commonwealth v. Howard,* 538 Pa. 86, 93, 645 A.2d 1300, 1304 (1994). Counsel's assistance is deemed constitutionally effective once we are able to conclude that the underlying claim is not of arguable merit, *Commonwealth v.*

*Johnson,* 527 Pa. 118, 122, 588 A.2d 1303, 1305 (1991), or that the particular course chosen by counsel had some reasonable basis designed to effectuate his client's interests, *Commonwealth v. Boyd,* 461 Pa. 17, 28, 334 A.2d 610, 616 (1975).

Appellant first claims that trial counsel was ineffective for failing to seek to suppress the evidence obtained in violation of Appellant's constitutional right to be free from unreasonable searches and seizures.[5] Specifically, Appellant claims that because the police had no arrest or search warrant when they forcibly entered Ms. McClinchey's apartment to arrest her, allegedly without knocking and announcing their purpose, trial counsel was ineffective for "[making] no attempt to challenge the evidence seized as a fruit of the unlawful entry, arrest, and seizures." Brief for Appellant at 39. We disagree.

Prior to trial, Appellant filed a motion to suppress evidence on various grounds. At the hearing on the motion, however, Appellant expressly withdrew her claims challenging the lawfulness of her arrest and the search of the murder scene and elected to litigate only the voluntariness of her confession to police. In fact, the court engaged in a colloquy with Appellant to ensure that she knowingly withdrew this portion of the motion to suppress.[6] Since Appellant's suppression hearing proceeded only in regards to the voluntariness of her confession, there is no record, findings of fact or conclusion of law regarding the legality of Appellant's arrest or the subsequent search of the murder scene.

**5.** Appellant also advances the underlying claim that the police violated her constitutional rights when they entered the murder scene, allegedly without knocking or announcing their purpose, and searched the premises and arrested her without obtaining a warrant and without any exigency justifying the absence of a warrant. Accordingly, Appellant maintains that all evidence seized as a result of the allegedly unlawful arrest and search should have been suppressed.

**6.** At the start of the suppression hearing, Appellant agreed on the record to withdraw her suppression motion on the lawfulness of the arrest and search. When asked whether she was satisfied with counsel's representation, Appellant did complain that counsel had failed to obtain some medical records. The record indicates, however, that the problem in obtaining those records stemmed from Appellant's failure to give counsel the proper name, out of several she had apparently used over time, which the relevant records were under.

While Appellant's withdrawal of this claim at the suppression hearing leaves this Court without a proper evidentiary record upon which to review the merits of Appellant's claim that her constitutional rights were violated, *Commonwealth v. Gribble*, 550 Pa. 62, 79–81, 703 A.2d 426, 435 (1997) (appellate court may consider only the facts in the record), Appellant also claims, in the alternative, that counsel was ineffective for failing to litigate this portion of the suppression motion. In rejecting this claim, we are guided by the disposition of the almost identical issue raised by Appellant's co-defendant, William Gribble, in his direct appeal to this Court. There, this Court also held that Gribble's claim that his confession was the product of an illegal arrest, never ruled upon by the trial court as a result of Gribble's own withdrawal of this issue at the suppression hearing, was waived and could not be reviewed by this Court for lack of an appropriate record on the issue. *Id.* In *Gribble*, Madame Justice Newman, writing for the Court, stated:

> Even if we were able to consider the merits of Gribble's suppression claim, Gribble would not be entitled to relief. The United States Supreme Court has stated the following about the warrantless entry of a home: 'The Fourth Amendment generally prohibits the warrantless entry of a person's home, whether to make an arrest or to search for specific objects. The prohibition does not apply, however, to situations in which voluntary consent has been obtained, either from the individual whose property is searched, or from a third party who possesses common authority over the premises.' *Illinois v. Rodriguez*, 497 U.S. 177, 181, 110 S.Ct. 2793, 2797–98, 111 L.Ed.2d 148 (1990) (other citations omitted). Here, it was McClinchey who contacted the police and informed them of her suspicion that Gribble and O'Donnell, who were staying in her apartment, had committed a murder. Thus, had Gribble given the Commonwealth the opportunity to present testimony and other evidence at a suppression hearing, the Commonwealth would have been able to show that McClinchey consented to the entry of her apartment without a warrant.

Additionally, the Commonwealth could have also argued that exigent circumstances excused the lack of a warrant. During cross-examination at trial, Detective Michael Gross explained the reason for his decision to enter the residence without a warrant as follows: 'I had two people inside the house who we believed had killed and cut up a man, and I had a 65 year old man in there with them, and I felt for his safety that we should go in there right away.' (Notes of Testimony, June 29, 1993 at 326). With a full opportunity at a suppression hearing to develop Detective Gross's testimony and produce additional evidence, the Commonwealth likely would have been able to demonstrate the existence of exigent circumstances..... Thus, there would have been no basis [for suppression].

*Gribble,* 550 Pa. at 80 n. 18, 703 A.2d at 435 n. 18.

The same reasoning is equally applicable to Appellant's claim here that trial counsel was ineffective for failing to litigate a motion to suppress the evidence obtained from an allegedly illegal search and arrest. Thus, we agree with the Commonwealth that the record supports trial counsel's decision to withdraw this portion of Appellant's motion to suppress and therefore, that this claim is without arguable merit.

■ Next, Appellant claims that counsel was ineffective for failing to object to evidence of her drug addiction. Specifically, Appellant argues that her trial counsel was ineffective for failing to object to Agnes McClinchey's testimony that she had used drugs with Appellant and to the testimony of an employee of Mr. Eleftheriou's pizza shop that Appellant was a known drug user. This claim is without merit.

As the Commonwealth observes, Appellant's trial counsel was left with few strategic options given Appellant's confession and the other evidence of Appellant's guilt. However, the record reflects that trial counsel permitted reference to Appellant's addiction as part of the defense strategy to persuade the fact-finder that Appellant had every reason to keep Mr. Eleftheriou, who had provided Appellant with money in the past, alive. In his closing argument, trial counsel specifically

argued that Appellant had no motive to kill the victim because he provided her with a steady stream of cash to support her drug habit. Appellant now refers to this strategy as "bizarre."

Trial counsel's decision to acknowledge Appellant's drug addiction and to attempt to use it to obtain an acquittal cannot be said to be unreasonable. *See Commonwealth v. Albrecht,* 510 Pa. 603, 626, 511 A.2d 764, 776 (1986), *cert. denied,* 480 U.S. 951, 107 S.Ct. 1617, 94 L.Ed.2d 801 (1987) (counsel cannot be found ineffective unless his or her actions were so lacking in reason that in light of all the alternatives available, no competent lawyer would have chosen it). Since counsel cannot be ineffective for selecting one reasonable course from others that may be available, *Commonwealth v. Ly,* 528 Pa. 523, 533, 599 A.2d 613, 618 (1991), we decline to find that counsel was ineffective for acknowledging Appellant's drug addiction and attempting to use it to obtain an acquittal. Accordingly, Appellant is not entitled to a new trial on this basis.

■ In the alternative, however, Appellant suggests that the matter should at least be remanded for an evidentiary hearing. However, this Court has held that remand for an evidentiary hearing is unnecessary when it is clear that an objectively reasonable basis designed to effectuate the client's interest existed for counsel's action. *Commonwealth v. Clemmons,* 505 Pa. 356, 360, 479 A.2d 955, 957 (1984) (remand for evidentiary hearing inappropriate where record indicates that counsel's actions had rational basis); *Commonwealth v. Twiggs,* 460 Pa. 105, 111, 331 A.2d 440, 443 (1975). This claim, therefore, also fails to offer Appellant any basis for relief.

### B. Other Claims of Error at the Guilt Phase of Appellant's Trial

■ Appellant next contends that her jury trial waiver colloquy at the guilt phase of her trial was inadequate since the trial court failed to inform Appellant that she would have the right to "life-qualify" the jury and misinformed Appellant about who would be eligible to serve on the jury before which

she was tried. *See Commonwealth v. Henry,* 550 Pa. 346, 368–70, 706 A.2d 313, 324 (1997) (term life-qualify refers to process in which counsel identifies and excludes those prospective jurors who would be unable to consider sentence of life imprisonment). Although the waiver colloquy was not challenged at trial, in light of our relaxed waiver policy, we will nonetheless address the merits of this claim since we are able to do so from the record.

To support her contention, Appellant refers to the following portion of the colloquy, where the trial court stated:

I would ask the jurors to see if they would be impartial and fair and if they were competent to sit as jurors in this case. Since this is a capital case, I would also death qualify them to make sure anybody who absolutely objects to the death penalty for any reason, and would not impose it under any circumstances, would be challenged from the jury.

I would also ask them if requested to about their feelings about capital punishment and whether it would substantially impair them from implementing it.

Appellant claims that since she was not also explicitly informed that the jurors would be asked if their views on capital punishment would substantially impair them from choosing to impose a life sentence, she was led to believe that "she would be tried by a jury composed exclusively of death penalty supporters – and perhaps of jurors who would automatically impose death if it convicted her of murder." Brief for Appellant at 41. Because of this alleged misconception, Appellant now claims that her waiver to a guilt-phase jury trial was not knowing and intelligent. We disagree.

Contrary to Appellant's assertions, the court's statement did not inform Appellant that her jury would be unalterably in favor of the death penalty regardless of the evidence or of the law, but rather comported with applicable law. *See Commonwealth v. Jasper,* 531 Pa. 1, 8, 610 A.2d 949, 952 (1992) (juror is properly excluded whenever juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his

instructions and his oath). Moreover, Appellant does not cite, nor does research indicate, any statute, rule of criminal procedure or case law to support her position that a guilt-phase jury waiver colloquy inform the defendant of her right to "life-qualify" the jury. Rather, the law is that a voluntary waiver of a trial by jury will be found to be knowing and intelligent when the on-record colloquy indicates that the defendant knew the essential ingredients of a jury trial which are necessary to understand the significance of the right being waived. *Commonwealth v. Williams*, 454 Pa. 368, 373, 312 A.2d 597, 600 (1973). These essential ingredients are the requirements that the jury be chosen from members of the community (a jury of one's peers), that the verdict be unanimous, and that the accused be allowed to participate in the selection of the jury panel. *Id.* Here, the on-record colloquy conducted before the trial judge in the guilt phase of Appellant's trial indicates that Appellant was apprised of all three of these essential ingredients and sufficiently informed of the import of her decision to waive a jury trial in determining her guilt. Since there is no requirement that a trial court inform a defendant of any right to life-qualify a jury prior to accepting a valid waiver, Appellant fails to establish that her waiver to a guilt-phase jury trial was not knowing and intelligent.[7]

7. The Commonwealth asserts that, although Appellant does not allege that trial counsel was ineffective for failing to object to this colloquy at trial, the claim of trial court error has been waived and must, therefore, be reviewed under an ineffectiveness standard. Given our disposition of the issue, it is clear that we agree with the Commonwealth that this claim also fails when reviewed under an ineffectiveness standard. Since trial counsel had no basis for demanding that Appellant's jury trial waiver colloquy contain information about life-qualification, Appellant's claim is without arguable merit. Moreover, we note that the applicable law regarding life-qualification of a jury is that when a defendant elects a jury, he or she is permitted, on request, to ask life-qualifying questions during voir dire. *See Morgan v. Illinois*, 504 U.S. 719, 735, 112 S.Ct. 2222, 2227, 119 L.Ed.2d 492 (1992); *Commonwealth v. Blount*, 538 Pa. 156, 163, 647 A.2d 199, 203 (1994) (defendant is permitted to pose life-qualifying questions during voir dire). Counsel is not required to ask life-qualifying questions during voir dire and is not rendered ineffective for failing to life-qualify a jury. *See Commonwealth v. Lark*, 548 Pa. 441, 451, 698 A.2d 43, 48 (1997) (life-qualifying questions not required to be asked by counsel); *Henry*, 550 Pa. at 368–70, 706 A.2d at 324; *Commonwealth v. Morris*, 546 Pa. 296, 309, 684

Appellant next asserts that she is entitled to a new trial because the court refused to consider her co-defendant's admission that he, and not Appellant, committed the murder of Mr. Eleftheriou. Although Appellant concedes that this claim is technically waived, we will nonetheless consider the merits of this claim in accordance with the relaxed waiver rule of *Zettlemoyer*, 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

At trial, the Commonwealth introduced into evidence statements made by Appellant and Gribble. In his statement, Gribble claimed that he had killed Mr. Eleftheriou when he came home and saw him fondling Appellant. In closing, Appellant's trial counsel argued that Gribble's statement was an accurate rendition of the murder. The trial court, however, told counsel that he could "only use the statements against the respective party." N.T. at 509–10. Although there was no objection to the trial court's statement at trial, Appellant now argues that she is entitled to a new trial since the trial court's refusal to consider relevant evidence of Appellant's innocence violated her right to present favorable evidence in accordance with her due process rights. We disagree.

In the first instance, Appellant's argument ignores that she herself tried to take sole responsibility for the murder in her own voluntary statement to the police. The trial judge, sitting as the fact-finder, had no obligation to disregard the substance of Appellant's confession, which was properly admitted into evidence, when determining Appellant's guilt. Moreover, this claim, contrary to Appellant's argument, does not involve any evidentiary errors in failing to admit exculpatory evidence into trial.[8] Both statements, including Gribble's statement which

A.2d 1037, 1043 (1996) (counsel not ineffective for failing to ask life-qualifying questions during voir dire when jurors asked if they could be fair and follow instructions).

8. Appellant cites *Washington v. Texas*, 388 U.S. 14, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), *Commonwealth v. Bracero*, 515 Pa. 355, 528 A.2d 936 (1987) and *Commonwealth v. Hackett*, 225 Pa.Super. 22, 307 A.2d 334 (1973) to support her contention that the trial judge's statement regarding his consideration of Gribble's statement in determining her guilt violated her right to present favorable evidence. Each of these cases, however, addresses the admissibility of, and not the weight to be assigned to, particular evidence. *See Washington v. Texas, supra* (defen-

asserted that he killed Mr. Eleftheriou, were admitted at trial. The trial court, sitting as fact-finder, was free to afford whatever weight it deemed appropriate to the evidence admitted at trial, including each of the confessions. *See Commonwealth v. Roberts*, 496 Pa. 428, 434, 437 A.2d 948, 951 (1981) (it is the province of the fact-finder to determine the weight to be assigned to evidence admitted at trial); *Commonwealth v. Yost*, 478 Pa. 327, 332, 386 A.2d 956, 958 (1978) (fact-finder is free to believe all, part or none of the evidence). Accordingly, this claim fails.

■ Further, even if we were to find that the trial court's failure to consider Gribble's statement in determining Appellant's guilt constituted error, such error would clearly be harmless. Given Appellant's confession to police, her admissions made to Agnes McClinchey, the physical evidence uncovered by the police, and the testimony of the medical examiner, the evidence of Appellant's guilt was clearly overwhelming. Accordingly, we are convinced that any error potentially arising from the trial court's statement regarding the applicability of Gribble's confession to the consideration of Appellant's guilt would not have altered the verdict, and thus, was harmless. *See Commonwealth v. Story*, 476 Pa. 391, 412, 383 A.2d 155, 166 (1978) (error is harmless where appellate court determines that error did not contribute to the verdict).

■ Next, Appellant essentially alleges that she was "drugged" by the state during her trial and that the trial court's resolution of the competency issues stemming from her drug intake was inadequate and constitutionally defective. We disagree.

As background, we initially note that there was a pre-trial determination of Appellant's competency. The trial judge

dant has right to offer testimony of witnesses to establish a defense and truth is more easily ascertained when court allows relevant testimony to be admitted, leaving the weight of such testimony to be determined by fact-finder); *Bracero, supra* (trial court did not err in excluding certain exculpatory evidence, namely, statement by declarant allegedly confessing to the burglary which defendant had been charged with, offered by defendant at trial); *Hackett, supra* (trial court erred in refusing to admit exculpatory statements into evidence).

originally assigned to Appellant's case ordered a psychiatric examination for competency and found Appellant competent on June 7, 1993, one week before trial began. Appellant did not object to this finding. During her guilt-phase jury trial waiver colloquy before the trial court, Appellant stated that she was taking a drug for her seizures, which had no side effects that would prevent her from understanding the proceedings. She told the court that she was awake and understood what the court was saying. After the penalty hearing began, and at the beginning of the colloquy regarding Appellant's right to testify, Appellant informed the court that she had understood what had been said so far. The court then inquired whether Appellant had taken any medication that day. Appellant responded that she had taken tranxene, trazodene, haldol, phenobarbital and mysoline. At that point, trial counsel asserted that Appellant was not competent. The trial court postponed the hearing and *sua sponte* ordered a psychiatric examination. However, referring to its previous colloquy regarding Appellant's right to testify and its observations of Appellant's responsiveness throughout trial, the trial court also stated its belief that Appellant had been competent during trial but indicated that it would withhold a final determination until it had heard from the psychiatrist.

After examining Appellant, the psychiatrist reported that he found her to be alert and responsive and determined that she was competent to participate in the penalty phase. He informed the court of the medications Appellant was then taking and their effects upon her ability to participate in the penalty hearing.[9] After the psychiatrist found Appellant to be competent, the penalty hearing continued without objection. Although Appellant did not object to the findings regarding her competency, failing to preserve this issue which she now raises

9. The psychiatrist testified that two of the medications were to control Appellant's seizures, two were tranquilizers and one was an antidepressant. Although the psychiatrist stated that these medications could make Appellant drowsy, he opined that the medications would not interfere with her competency or capacity to be rational, and perhaps would even be helpful. Further, after the doctor's testimony, it was agreed that if, at any time, counsel felt Appellant was drowsy, the proceedings would stop.

on appeal, we review this claim on its merits given our relaxed waiver rule and that the record permits such review. *See Zettlemoyer*, 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19.

Appellant, by her own admission, suffers from a seizure disorder. Without any offer of proof, Appellant now baldly accuses the Commonwealth of "drugging her" against her will. Despite the absence of any support substantiating her claim, Appellant asserts that she was entitled to a colloquy on the Commonwealth's reasons for drugging her under *Riggins v. Nevada.* 504 U.S. 127, 112 S.Ct. 1810, 118 L.Ed.2d 479 (1992) (forced administration of anti-psychotic drugs during trial violates a defendant's due process rights). We disagree.

Rather, we find that Appellant's reliance on *Riggins* is misplaced. In *Riggins,* the United States Supreme Court held that once a defendant moves to terminate the administration of *anti-psychotic* medication during his trial, the state becomes obligated to establish the need for administering the drug. *Id.* at 135, 112 S.Ct. at 1815 (emphasis added). Once a defendant's motion to terminate the administration of drugs is denied, under *Riggins,* the administration of the medication becomes "involuntary." *Id.* Here, unlike in *Riggins,* Appellant never moved to suspend the administration of her seizure prevention or other medication.[10] Further, Appellant does not now claim or offer evidence—nor did she at trial—that the medication was taken involuntarily during either phase of her trial. Pursuant to *Riggins,* then, the Commonwealth had no burden to establish, as Appellant claims, the medical appropriateness of the drugs Appellant was taking. As a result, we also reject Appellant's passing claim that she is entitled to a new trial on the basis that counsel was ineffective for not objecting to "the drugging," since this claim is without arguable merit. *See Commonwealth v. Hentosh,* 520 Pa. 325, 334,

---

10. Also, the defendant in *Riggins,* who was presenting an insanity defense, moved to suspend the administration of anti-psychotic drugs on the basis that their effect on his demeanor and mental state deprived him of the opportunity to show the jury his "true mental state." *Riggins,* 504 U.S. at 130, 112 S.Ct. at 1813. Appellant makes no such claim here.

554 A.2d 20, 24 (1989) (accuracy of ineffectiveness claim must be established by submission of relevant proof).

Appellant also more generally complains that the trial court failed to appropriately resolve her competency issues or give her an adequate competency hearing. As the Commonwealth points out, however, Appellant never requested any further hearing and did not offer to present any evidence during the competency hearing held at the directive of the trial court. *See Commonwealth v. Jones,* 546 Pa. 161, 180, 683 A.2d 1181, 1190 (1996) (person asserting incompetency to stand trial has burden to establish such incompetency). Even now, Appellant does not claim that she is incompetent or offer what evidence should have been presented to establish that she was incompetent during either phase of her trial. *See Commonwealth v. McGill,* 545 Pa. 180, 184–86, 680 A.2d 1131, 1134 (1996), *cert. denied,* 519 U.S. 1152, 117 S.Ct. 1087, 137 L.Ed.2d 221 (1997) (claim that trial court did not monitor defendant's competency does not rise to level of cognizable claim of error where defendant does not claim incompetency on appeal).

We find that the trial court acted within its discretion in determining that Appellant was competent to stand trial. *Commonwealth v. Logan,* 519 Pa. 607, 624, 549 A.2d 531, 540 (1988) (determination of competency rests in sound discretion of trial court). The record reflects that the trial court based its determination that Appellant was competent on its own observations and colloquies of Appellant as well as the conclusions of the psychiatrists who evaluated Appellant and found her to be competent. *See McGill,* 545 Pa. at 186–88, 680 A.2d 1131 at 1135 (trial court did not abuse its discretion in ruling that defendant was competent throughout proceedings when court's conclusion was based on colloquies conducted with defendant, first-hand observation of defendant throughout trial and doctors' reports); *Jones,* 546 Pa. at 181, 683 A.2d at 1190–91 (defendant's due process rights were not violated where defendant, who underwent trial while taking anti-anxiety medications, was twice ordered to undergo psychiatric evaluations and twice found to be competent to stand trial, nor was counsel ineffective for failing to further pursue issue of

defendant's competency). Accordingly, this claim, like Appellant's other claims of error in the guilt phase of her trial, does not provide a basis for disturbing Appellant's convictions.

## C. Claims of Error at the Penalty Phase of Appellant's Trial

Regarding her claims of error in the penalty phase of her trial, Appellant first essentially argues that her waiver of a penalty-phase jury for sentencing was invalid where she never personally waived her right to have a jury determine the penalty and where the trial court conducted no colloquy concerning her right to a penalty-phase jury. We agree.[11]

Under Pennsylvania law, a capital defendant tried without a jury in the guilt phase still has a right to a jury in the penalty phase of the trial. *See Commonwealth v. Michael,* 544 Pa. 105, 109 n. 4, 674 A.2d 1044, 1046 n. 4 (1996) (capital defendant, who pled guilty to first degree murder, was informed of right to be sentenced by a jury); *Commonwealth v. Pirela,* 510 Pa. 43, 54, 507 A.2d 23, 29 (1986) (during waiver colloquy preceding penalty phase, trial court informed defendant, who had waived jury in guilt phase of trial, of right to trial by jury at penalty phase). The relevant portion of the statute governing sentencing procedures in capital cases, 42 Pa.C.S. § 9711(b), explicitly states that:

> if the defendant has waived a jury trial or pleaded guilty, the sentencing proceeding shall be conducted before a jury impaneled for that purpose unless waived by the defendant with the consent of the Commonwealth . . .

42 Pa.C.S. § 9711(b). The language of section 9711(b) clearly indicates that if the defendant has waived a jury trial in the guilt phase, as Appellant did here, the defendant is still entitled to have a jury determine his sentence unless he

---

**11.** While trial counsel did not object to the procedure used by the trial court prior to accepting counsel's indication that Appellant wished to waive her right to a penalty-phase jury, thereby failing to preserve this claim for appellate review, we address the merits of the claim in accordance with the relaxed waiver rule of *Zettlemoyer,* 500 Pa. at 50 n. 19, 454 A.2d at 955 n. 19 (court will relax waiver rules in capital cases and address merits of waived claim when possible to do so from record).

specifically waives that right without objection by the Commonwealth. *See, e.g., Commonwealth v. Buck,* 551 Pa. 184, 709 A.2d 892, 896 n. 4 (1998) (if defendant is tried non-jury he may, with consent of Commonwealth, waive his right to have his sentencing hearing conducted before a jury); *Zettlemoyer,* 500 Pa. at 42 n. 12, 454 A.2d at 951 n. 12 (if defendant has waived a jury trial in guilt phase, a jury may still be impaneled for the sentencing proceeding under § 9711(b)); *Cf. Commonwealth v. Bryant,* 524 Pa. 564, 575, 574 A.2d 590, 596 (1990) (trial court had no authority to permit defendant to waive a jury for the sentencing phase of the proceeding when defendant neither waived guilt-phase jury trial nor pleaded guilty).

As Appellant observes, this Court has never addressed the procedural requirements for the waiver of a penalty-phase jury under Pennsylvania law. However, both case law and Pennsylvania Rule of Criminal Procedure 1101 ("Rule 1101") have established the general principles underlying the waiver of a jury trial. *See also* Comment to Pa. R.Crim. P. 354 (waiver of jury trial in a capital prosecution shall be conducted pursuant to Rule 1101). It is well established that a defendant's waiver of a trial by jury must be knowing, voluntary and intelligent. *See, e.g., Commonwealth v. Stokes,* 450 Pa. 167, 169, 299 A.2d 272, 273 (1973). In this vein, Rule 1101 requires a trial judge, through a colloquy on the record, to ascertain whether a defendant has knowingly and intelligently waived his right to a jury trial before approving such waiver. Before a voluntary waiver may be accepted as knowing and intelligent, the on-record colloquy must show that the defendant fully comprehended the significance of the right being waived and must indicate that, at a minimum, the defendant knew the essential protections inherent in a jury trial as well as the consequences attendant upon a relinquishment of those safeguards. *Commonwealth v. Morin,* 477 Pa. 80, 85, 383 A.2d 832, 834 (1978).

We believe these principles are equally applicable to a capital defendant's waiver of his right to be sentenced by a jury pursuant to 42 Pa.C.S. § 9711(b). *See Spaziano v. Florida,* 468 U.S. 447, 464–65, 104 S.Ct. 3154, 3164–65, 82

L.Ed.2d 340 (1984) (defendant does not have federal constitutional right to be sentenced by jury in capital cases but whether judge or jury makes ultimate decision in capital sentencing proceeding may be determined by state statute); *Evitts v. Lucey*, 469 U.S. 387, 401, 105 S.Ct. 830, 839, 83 L.Ed.2d 821 (1985) (once state opts to act in certain field, it must act in accord with Constitution). Accordingly, we find that a capital defendant's waiver to his statutory right to a penalty-phase jury must be knowing, voluntary and intelligent. *Accord People v. Todd*, 178 Ill.2d 297, 312, 227 Ill.Dec. 516, 522, 687 N.E.2d 998, 1004 (1997) (while defendant's right to jury at capital sentencing in Illinois is statutory in origin, defendant's waiver of such right must be knowing, voluntary and intelligent); *People v. Erickson*, 117 Ill.2d 271, 288, 111 Ill.Dec. 924, 513 N.E.2d 367, 374 (1987) (same principles with respect to waiver of constitutional right to trial by jury govern waiver of such statutorily created rights as that to a capital sentencing jury); *Jones v. Maryland*, 310 Md. 569, 597, 530 A.2d 743, 757 (1987) (to be effective, waiver of statutory right to sentencing jury in capital case must be made knowingly and voluntarily).

Here, following Appellant's conviction, the Commonwealth told the court that there was no objection to the sentencing proceeding being heard by a jury or by the judge. Defense counsel indicated that a jury would be waived. The Commonwealth then requested that the Appellant be colloquyed. In response, the court made the following statement:

Let me say this: the defendants do not have to answer.

I want to make it clear that they are entitled to a jury trial in the death penalty phase.

We can go through the jury selection process, and they can present any testimony that you want to present in mitigation of the application of the death penalty, and then the jury would be asked to consider everything in connection with the case that you want to bring out.

The entire record would be open to the jury and the jury can make the final decision, that's their right at this point.

If they want to waive a jury, of course, that has to be agreed to by the Commonwealth. It does not matter to me one way or the other. If they wish a jury trial, they are entitled to have it.

The jury would be entitled to be made aware of everything in the record that you want to bring out to the jury. The record would be in front of them and anything you want to bring out in mitigation of the death penalty.

Appellant's counsel then declared that Appellant had been made aware of her rights and that she would waive her right to a sentencing jury. No further inquiry was made.

We believe that this colloquy is inadequate to show a knowing, voluntary and intelligent waiver of a sentencing jury for the penalty phase of a capital case. Even the most charitable reading of the record indicates that there was no meaningful colloquy of Appellant and no indication that she understood the significance of her decision. Unquestionably, a colloquy envisions an effort to ascertain whether the defendant understands the nature of the right he seeks to forfeit as well as the consequences of such a waiver. Here, the trial court did not ask Appellant, for example, if she understood that she had a right to be sentenced by a jury, whether she was voluntarily giving up such a right or whether she understood what waiving that right would mean. Appellant was not asked if she had discussed a decision to waive a penalty-phase jury with her attorney or even whether she in fact wished to waive that right.[12] *Cf. Michael*, 544 Pa. at 109 n. 4, 674 A.2d at 1046 n. 4 (trial court appropriately accepted capital defendant's waiver of his right to present evidence of mitigating circumstances and to be sentenced by a jury, when court conducted lengthy colloquy and defendant stated that he had discussed his decision with his attorney and indicated on the record that he understood his rights as well as the consequence of forfeiting those rights but still wished to waive them).

**12.** Like the waiver of a jury trial, we find that any waiver to a capital defendant's right to a penalty-phase jury must be considered a personal right of the defendant's. *See Morin*, 477 Pa. at 84, 383 A.2d at 834.

■ Since the record is devoid of any inquiry indicating that Appellant had sufficient knowledge of what, in fact, she was waiving, we are unable to find that her waiver of a penalty-phase jury was knowing and intelligent. While we do not provide a mechanical listing of what must be included in a colloquy regarding a capital defendant's waiver to a penalty-phase jury, it is clear that the colloquy must be an on-record dialogue, which is calculated to insure the defendant comprehends the nature and significance of the right being waived. At the very least, the defendant should be asked if he understands that he has the right to be sentenced by a penalty-phase jury, and whether any waiver to that right has been based on promises or coercion. Given the unique role a sentencing jury plays in the penalty phase of a capital case, *see Commonwealth v. Faulkner,* 528 Pa. 57, 72, 595 A.2d 28, 36 (1991) (capital cases are unique in that jury and not the judge sets penalty), it also seems appropriate for any colloquy preceding a trial court's acceptance of a capital defendant's waiver to a penalty-phase jury to inform the defendant of the requirement under Pennsylvania law that a penalty-phase jury render a unanimous verdict. The defendant should be asked, in other words, whether he understands that, if elected, a twelve member jury would be required to unanimously agree that a sentence of death is appropriate before imposing such a verdict on a defendant. *See* 42 Pa.C.S. § 9711(a)(4); 42 Pa.C.S. § 9711(c)(1)(v); *Commonwealth v. Frey,* 520 Pa. 338, 347, 554 A.2d 27, 31 (1989), *cert. denied,* 494 U.S. 1038, 110 S.Ct. 1500, 108 L.Ed.2d 635 (1990) (unanimous verdict is necessary as to the ultimate decision to impose a sentence of death).

Since the instant colloquy failed to ascertain whether Appellant understood her right to be sentenced by a jury or the requirement that a penalty-phase jury's decision be unanimous, or even whether any asserted waiver was given voluntarily, we find this colloquy insufficient to establish a knowing, intelligent and voluntary waiver of Appellant's right to a sentencing jury in the penalty phase of her trial.[13]

13. Given our finding that the instant waiver was deficient, requiring a new penalty phase hearing, we need not address Appellant's remaining

Accordingly, we affirm Appellant's convictions but vacate the judgment of sentence and remand for a new penalty phase hearing.

Justice CASTILLE files a dissenting opinion in which Justice NEWMAN joins.

CASTILLE, Justice, dissenting.

The majority holds that a court's defective waiver colloquy *per se* requires that a defendant's sentence be vacated notwithstanding other evidence which would demonstrate that appellant's waiver of a jury during the penalty phase was knowingly and voluntarily made. The majority ignores not only appellant's counsel's statement on-the-record that appellant *had* been made aware of her rights before she waived her right to a penalty-phase jury, but also appellant's extensive guilt phase jury waiver colloquy. I believe sufficient evidence exists of record to demonstrate that the waiver was valid; however, I would remand the case to the trial court to conduct an evidentiary hearing to determine whether trial counsel's assertions about informing appellant of her rights were sufficiently credible to support the conclusion that appellant made a knowing, voluntary and intelligent waiver. To hold other-

claims of error in the penalty phase of her trial. However, we feel compelled to note that the record raises serious doubts regarding counsel's effectiveness during the penalty phase of Appellant's trial. Counsel's entire defense presentation during the penalty phase took only four pages to transcribe. He presented virtually no evidence of Appellant's upbringing or background; he did not present any independent mental health evaluations or institutional or other records; he did not call a single witness on Appellant's behalf. Instead, as evidence of mitigation, counsel merely relied on stipulations that Appellant had no history of prior criminal convictions, was the mother of six children, and was a drug user. He failed to present or argue any further evidence of mitigation even though the record itself indicates that other evidence of mitigation was available and known to counsel. Without dissecting all of the arguments presented by both parties, it is difficult to disagree with Appellant that a defense which amasses only four pages of transcript simply does not reflect adequate preparation or development of mitigating evidence by counsel representing a capital defendant in a penalty phase hearing. *See Commonwealth v. Perry*, 537 Pa. 385, 392, 644 A.2d 705, 709 (1994) ("it is not possible to provide a reasonable justification for appearing in front of a death penalty [sentencer] without thorough preparation").

wise, allows a defendant to sit idly by as the court conducts a possibly deficient colloquy concerning a waiver of a jury trial and then claim error once an unfavorable verdict and sentence is imposed. The crux of the issue in question is whether appellant knew and understood her rights so that a valid waiver of those rights could occur, not whether the court informed her of those rights. Whether a trial court informs a defendant of her rights on the record is simply one factor for consideration, not a litmus test.

In the instant matter, there are several factors which confirm that appellant's waiver was knowing, voluntary and intelligent. The trial record reflects that the Commonwealth asked the trial judge to conduct a jury waiver colloquy prior to proceeding to the sentencing phase in this bifurcated capital case. The trial judge proceeded with a colloquy of appellant and her co-defendant, William Gribble,[1] regarding their right to a jury during the sentencing phase in a capital case. Specifically the colloquy was as follows:

Prosecutor: Your honor, again I would ask the court's indulgence, if the court would briefly colloquy the defendants as to their agreement to waive a jury trial for the purposes of this penalty phase.

The Court: All right.

Let me say this: the defendants do not have to answer. I want to make it clear that they are entitled to a jury trial in the death penalty phase.

We can go through the jury selection process, and they can present testimony that you want to present in mitigation of the death penalty, and then the jury would be asked to consider everything in connection with the case that you want to bring out.

The entire record would be open to the jury and the jury can make the final decision. That's their right at this point.

If they want to waive the jury, of course, then it has to be agreed to by the Commonwealth.

1. *See Commonwealth v. Gribble,* 550 Pa. 62, 703 A.2d 426 (1997)

It does not matter to me one way or the other. If they wish a jury trial, they are entitled to have it.

The jury would be entitled to be made aware of everything in the record that you want to bring out to the jury. The record would be in front them and anything you want to bring out in mitigation of the death penalty.

After the court's colloquy, the attorney for the co-defendant stated in open court in the presence of appellant and her counsel:

I have explained to Mr. Gribble, your honor what his rights are, that he would be entitled to a jury trial.

Also that they would be entitled to consider the evidence, and they would make the final decision.

Mr. Gribble agrees that he will waive a jury and have your honor decide his fate.

Appellant's counsel then proceeded to make the following statement:

Miss. O'Donnell has been made aware of her rights and she also will waive her right to a jury.

(N.T. 6/30/93 p. 545–546).

Moreover, prior to appellant's waiver of a jury during the guilt phase of the trial, the trial judge engaged in an extended colloquy with appellant apprising her of her constitutional rights. Before beginning the colloquy, the trial judge encouraged appellant to ask questions if there was any aspect of the colloquy she did not understand. The trial judge proceeded to ask appellant several questions regarding her educational background and mental state. The court also advised her of the various aspects and differences between a jury trial and a trial without a jury. Prior to completing the colloquy, the court urged appellant to inquire further if during the trial there was some aspect which she did not understand. The court stated: "If you do not understand anything that is going on, you have a right to tell your attorney and *make it known to the judge.*" (Emphasis added). Clearly, in assessing whether appellant was adequately apprised of her right to a jury trial, the fact that the trial court adequately explained to

her the aspects of a jury prior to proceeding to the guilt phase of the trial, evidences, in part, that appellant was cognizant of her right to a jury so that she could have made a knowing, voluntary, and intelligent waiver of a jury at the sentencing phase of the same matter without a repetitive waiver colloquy.

While the record may not be clear as to whether trial counsel's statement was accurate (i.e., whether appellant was adequately advised of her rights and then waived them), it is equally unclear that the statement was inaccurate. Therefore, a better course than simply reversing the sentence in this capital case would be to remand the matter to the trial court for an evidentiary hearing to consider whether appellant's waiver was knowing, voluntary and intelligent; notwithstanding the alleged defective court colloquy.

Recently, in *Peguero v. United States*, 526 U.S. 23, 119 S.Ct. 961, 143 L.Ed.2d 18 (1999), the United States Supreme Court considered whether a trial court's failure to advise a defendant of his right to appeal a sentence, as required by Federal Rule of Civil Procedure 32(a)(2), provides a basis for collateral relief even when the defendant was otherwise made aware of his right to appeal.[2] In *Peguero*, based upon the defendant's testimony at the evidentiary hearing that, upon being sentenced, he immediately asked his attorney to file an appeal, the trial court determined that the defendant's request that an appeal be taken indicated that he was aware of his right to appeal at sentencing and, therefore, that he was not entitled to collateral relief. *Id.* at 963. The United States Supreme Court agreed. The Court recognized that the trial judge

---

**2.** In 1992, when the defendant in *Peguero* was sentenced, Federal Rule of Civil Procedure 32(a)(2) provided:

Notification of Right To Appeal.—After imposing sentence in a case which has gone to trial on a plea of not guilty, the court shall advise the defendant of the defendant's right to appeal, including any right to appeal the sentence, and of the right of a person who is unable to pay the cost of an appeal to apply for leave to appeal in forma pauperis. There shall be no duty on the court to advise the defendant of any right of appeal after sentence is imposed following a plea of guilty or nolo contendere, except that the court shall advise the defendant of any right to appeal the sentence. If the defendant so requests, the clerk of the court shall prepare and file forthwith a notice of appeal on behalf of the defendant.

committed error in failing to advise the defendant on the record of his right to appeal and that the requirement that a trial judge inform the defendant of his right to appeal serves important functions, but, nevertheless, held that the defendant was not entitled to relief since he had full knowledge of his right to appeal, notwithstanding the trial court's error.

Past decisions of this Court are consistent with *Peguero.* In *Commonwealth v. Williams,* 454 Pa. 368, 312 A.2d 597 (1973), this Court considered the consequences of a trial judge's failure to comply with Pennsylvania Rule of Criminal Procedure 1101 by failing to conduct an on-the-record inquiry prior to accepting a defendant's waiver of a trial by jury.[3] After exhausting direct appeals, the defendant filed a petition under the Post–Conviction Hearing Act ("PCHA"),[4] contending that the trial court's failure to conduct an on-the-record waiver as required under Rule 1101 vitiated the entire proceedings and entitled him to a new trial. The defendant argued that this Court "should make a per se prophylactic rule reversing convictions for failure to comply with Rule 1101" and conduct an on-the-record colloquy "despite the fact that a subsequent

**3.** The Version of Rule 1101 in effect at the time of the trial in this case provided:

> Rule 1101. Waiver of Jury Trial.
> In all cases, except those in which a capital crime is charged, the defendant may waive a jury trial with the consent of his attorney, if any, the attorney for the Commonwealth, and approval by a judge of the court in which the case is pending, and elect to be tried by a judge without a jury. The judge shall ascertain from the defendant whether this is a knowing and intelligent waiver and such colloquy shall appear on the record. The waiver shall be in writing, made a part of the record and shall be in the following form . . .

The Rule has been amended several times since 1973 and currently provides:

> In all cases, the defendant may waive a jury trial with approval by a judge of the court in which the case is pending, and elect to be tried by a judge without a jury. The judge shall ascertain from the defendant whether this is a knowing and intelligent waiver and such colloquy shall appear on the record. The waiver shall be in writing, made a part of the record, signed by the defendant, the judge, and the defendant's attorney as a witness.

**4.** 42 Pa.C.S. § 9541, et seq. The PCHA was modified in part, repealed in part, and renamed the Post Conviction Relief Act (PCRA), 42 Pa.C.S. § 9541, *et seq.*, effective April 13, 1988.

full and fair hearing proved the waiver of the constitutional right was knowing and intelligent." *Id.* at 372, 312 A.2d at 599–600. (emphasis added). This Court rejected the argument stating: "a prophylactic exclusionary rule is applied only in **extreme cases** where **all other attempts** to secure compliance have proven unsuccessful." *Id.* (emphasis added). Moreover, this Court recognized that:

> where there is a subsequent proceeding in which the waiver is proven to be knowing and intelligent on the record such a prophylactic rule seems unnecessary since the purposes of the rule to ensure the constitutionality of the waiver and our ability to review it, are satisfied.

*Id.* at 372–73, 312 A.2d at 600.[5] In the matter *sub judice*, by reversing the sentence without first remanding for an evidentiary hearing to determine whether the defendant's waiver was knowing, intelligent, and voluntary, the majority ignores the *Williams'* Court's admonishment against establishing a *per se* prophylactic rule.

Furthermore, in *Commonwealth v. DeGeorge*, 506 Pa. 445, 485 A.2d 1089 (1984), this Court considered an order of the Superior Court reversing the judgment of sentence on direct appeal based on trial counsel's ineffectiveness for failing to object to the trial court's acceptance of the defendant's waiver of a jury trial without first conducting an on-the-record colloquy as prescribed by Rule of Criminal Procedure 1101. The Superior Court in *DeGeorge* had relied on this Court's decision in *Commonwealth v. Morin*, 477 Pa. 80, 383 A.2d 832 (1978), which held that a reversal and remand for a new trial was the only remedy where the colloquy was inadequate under Rule

---

5. In *Williams*, this Court went on to find after considering the subsequent hearing, that the record failed to establish that the defendant had sufficient knowledge of the essential ingredients of a jury trial such that his waiver could be deemed knowing and intelligent and, therefore, awarded a new trial. The Court listed the essential ingredients basic to a jury trial, including:

> that the jury be chosen from members of the community (a jury of one's peers), that the verdict be unanimous, and that the accused be allowed to participate in the selection of the jury panel.
>
> *Id.* at 373, 312 A.2d at 600.

1101.[6]  This Court in *DeGeorge*, however, rejected the *per se* approach mandated by *Morin* and recognized that later opinions of this Court "permit the consideration of circumstances outside the content of the of-record colloquy in determining the validity of the waiver." *DeGeorge*, 506 Pa. at 448–49, 485 A.2d at 1091 (citing *Commonwealth v. Anthony*, 504 Pa. 551, 475 A.2d 1303 (1984) (rejecting defendant's post-conviction relief claim that he was entitled to withdraw his guilty plea since the trial court failed to advise him that a jury verdict must be unanimous prior to accepting the plea, where the record was clear that defendant's plea was knowingly and intelligently entered); *Commonwealth v. Carson*, 503 Pa. 369, 469 A.2d 599 (1983) (defendant not entitled to a new trial, notwithstanding defendant's post-conviction relief claim that waiver of jury trial colloquy was defective where the trial court did not inform defendant that the jury would be chosen from members of the community or from his peers, since the record established that defendant fully understood the ingredients of a jury trial and made a knowing and intelligent waiver); *Commonwealth v. Smith*, 498 Pa. 661, 664, 450 A.2d 973, 974 (1982) (on direct appeal holding that trial counsel was not ineffective for failing to object to jury trial waiver colloquy, notwithstanding trial judge's failure to explore defendant's understanding that the verdict would have to be unanimous and that defendant could participate in jury selection, "where the written form signed by [defendant], his counsel and the court states that [defendant] was indeed fully aware of these requirements."); *Commonwealth v. Williams*, 454 Pa. 368, 312 A.2d 597 (1973) (rejecting *per se* rule reversing convictions for failure to comply with Rule 1101 where subsequent post-conviction relief evidentiary hearing proves the

**6.**  In *Morin*, this Court found that its holding was mandated by this Court's earlier decision in *Commonwealth v. Ingram*, 455 Pa. 198, 316 A.2d 77 (1974).  In *Ingram*, this Court adopted a per se approach, similar to the rule advocated by the majority here, and held that a defendant's knowledge and understanding prior to entering a guilty plea was tested solely by the adequacy of the on-the-record guilty plea colloquy.  If the colloquy failed to demonstrate that the defendant understood the charge, the guilty plea was deemed invalid.  The decision in *Ingram* was overruled by this Court in *Commonwealth v. Schultz*, 505 Pa. 188, 477 A.2d 1328 (1984).

waiver was knowing and intelligent); *Commonwealth v. Schultz*, 505 Pa. 188, 477 A.2d 1328 (1984) (rejecting on direct appeal the per se approach of invalidating a guilty plea where the on-the-record guilty plea colloquy did not demonstrate that defendant's plea was voluntary and knowing); *Commonwealth v. Gardner*, 499 Pa. 263, 452 A.2d 1346 (1982) (defendant not entitled to withdraw guilty plea under PCHA, even though trial court did not inform defendant that he had a right to participate in the jury's selection and that the jury would be selected from the community since at a subsequent evidentiary hearing, trial counsel testified that prior to the inadequate colloquy he had twice informed defendant of the rights not mentioned by the trial court); *Commonwealth v. Martinez*, 499 Pa. 417, 419, 453 A.2d 940, 942 (1982) (holding on direct appeal that defendant was not entitled to withdrawal of guilty plea even though the trial court did not inform defendant of "the elements of the crimes or explanation of malice as an element of murder of the third degree" as mandated, where the record established that defendant received sufficient knowledge to establish that the plea was knowingly and voluntarily entered); *Commonwealth v. Shaffer*, 498 Pa. 342, 446 A.2d 591 (1982) (holding on direct appeal that defendant was not entitled to withdrawal of guilty plea for trial court's failure to explain the elements of the crimes to which the guilty pleas were entered)). Therefore, rather than reverse the judgment of sentence, this Court has consistently and categorically concluded that the better course was to remand the case to the trial court "for evidentiary proceedings to determine whether the waiver of trial by jury was knowing and intelligent." *Id.* at 450, 485 A.2d at 1091. The *DeGeorge* opinion embraces the concept that, when considering whether waiver of a trial by jury was knowing, voluntary and intelligent, the court should consider the totality of the circumstances rather than rely solely on the on-the-record colloquy.

Similarly, in *Commonwealth v. Schultz*, 505 Pa. 188, 477 A.2d 1328 (1984), this Court rejected the per se approach of invalidating a guilty plea where the on-the-record guilty plea colloquy did not demonstrate that defendant's plea was volun-

tary and knowing. This Court favored a more enlightened approach of allowing the court to consider the "totality of the circumstances" to determine if all of the circumstances surrounding the entry of the plea indicate the defendant's entry of the plea was knowing, intelligent and voluntary. I believe this is a more reasoned approach than the per se approach advocated by the majority.

In *Commonwealth v. Gardner*, 499 Pa. 263, 452 A.2d 1346 (1982), the defendant contended that he should be entitled to withdraw his guilty plea because the court failed to inform him that he had a right to participate in the jury selection and that the jury would be selected from members of the community when he entered the plea.[7] In considering the defendant's claim of ineffective assistance of counsel, this Court examined not only the oral and written plea colloquy, but also the off-the-record discussions between the defendant and trial counsel. In rejecting the defendant's claim, this Court credited the testimony of the defense trial counsel at the post-conviction evidentiary hearing that he twice informed the defendant of his rights not mentioned by the trial court in the record. The majority fails to consider the concept that the *Gardner* court made clear—off-the-record communications between an attorney and client are relevant to the question of whether the waiver was voluntarily, knowingly, and intelligently entered.

Most recently, in *Commonwealth v. Orville Allen*, 557 Pa. 135, 732 A.2d 582 (1999), we considered whether a defendant was entitled to post-conviction relief where the guilty plea colloquy failed to reflect on the record that the defendant was made aware of the possibility that consecutive sentences may be imposed. Again, we rejected appellant's request that we "create a per se rule which presumes that a miscarriage of justice has taken place whenever a plea colloquy does not contain a record of the trial court specifically informing a defendant about the possibility of consecutive sentences." *Id.* at 588 (emphasis added). Rather, we held that the trial court

---

7. In *Gardner*, the trial court did explain to the defendant "that he had a right to be tried by twelve individuals and that a jury's verdict of guilty would have to be unanimous." *Id.* at 265, 452 A.2d at 1346–47.

should determine defendant's actual knowledge by looking at the totality of the circumstances to distinguish whether the plea was voluntarily, knowingly, and intelligently made. In *Allen*, notwithstanding the trial court's failure to adequately advise the defendant on the record, the PCRA court determined that, when he entered his guilty plea, the defendant was aware that the sentences could be consecutive; therefore, we concluded that the defendant was not entitled to any post-conviction relief.[8]

As these cases uniformly demonstrate, this matter should be remanded so that the trial court can consider the totality of the circumstances to determine whether appellant's waiver was knowing, intelligent and voluntary based on the conversations alluded to between appellant and trial counsel and the lengthy colloquy conducted by the trial court earlier in the proceedings. This Court should follow the practical and sound reasoning of the United States Supreme Court's decision in *Peguero* and of the various decisions of this Court and remand this matter for a hearing on the issue of whether the totality of the circumstances surrounding the waiver demonstrate that appellant's waiver was knowingly and voluntarily made, rather than declare that a defective colloquy per se warrants reversal where a defendant is otherwise fully aware of the ramifications attendant to the waiver of a jury trial at one's penalty phase. Accordingly, I respectfully dissent.

Justice NEWMAN joins this dissenting opinion.

---

8. Conversely, in *Commonwealth v. Persinger*, 532 Pa. 317, 615 A.2d 1305 (1992), this Court held that defendant was entitled to withdraw his guilty plea where the trial court failed to inform him that sentences for multiple counts could be consecutive. Unlike in *Orville Allen*, however, in *Persinger*, the trial court made a factual determination that the defendant's waiver was not knowingly, voluntarily and intelligently entered, and specifically noted that "neither defense counsel nor the court explained to appellant that the sentences could result in consecutive terms of imprisonment." *Id.* at 332 n. 4, 615 A.2d at 1308 n. 4. Here, there *is* evidence to suggest that appellant was explained and understood her rights; thus, *Persinger* does not dispose of this matter.