610 A.2d 949

**COMMONWEALTH of Pennsylvania, Appellee,**

v.

**Alfred JASPER, Appellant.**

Supreme Court of Pennsylvania.

Argued Dec. 3, 1991.

Decided May 21, 1992.

2

4 

Marilyn J. Gelb, Philadelphia, for appellant.

Ronald Eisenberg, Deputy Dist. Atty., Catherine Marshall, Chief, Appeals Div., Harriet R. Brumberg, Philadelphia, Robert A. Graci, Chief Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

PAPADAKOS, Justice.

In this appeal, we review a sentence of death imposed upon the Appellant, Alfred Jasper, who was convicted in a jury trial

6

of one count each of murder in the first degree,[1] criminal conspiracy,[2] and possession of an instrument of crime [3] in the shooting death of Gregory Boykin. The penalty jury found three aggravating circumstances and no mitigating circumstances. The aggravating circumstances were number 9 (significant history of felony convictions involving the use or threat of violence to the person); number 10 (conviction of another offense for which a life sentence or death was possible; and number 11 (conviction of another murder committed either before or at the time of the offense).[4] Four allegations of error are asserted for our review.

■ In accordance with our responsibility in cases in which the death penalty has been imposed by the finder of fact, this Court has the independent obligation to review the sufficiency of the evidence supporting the conviction. 42 Pa.C.S. § 9711(h). *Commonwealth v. Zettlemoyer,* 500 Pa. 16, 454 A.2d 937 (1982), *cert. denied,* 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). The test to be applied is whether, viewing all of the evidence in the light most favorable to the Commonwealth as verdict winner, and drawing all reasonable inferences favorable to the Commonwealth, there is sufficient evidence to enable the trier of fact to find every element of the crime beyond a reasonable doubt. *Commonwealth v. Jermyn,* 516 Pa. 460, 533 A.2d 74 (1987); *Commonwealth v. Sneed,* 514 Pa. 597, 526 A.2d 749 (1987); *Commonwealth v. Holzer,* 480 Pa. 93, 389 A.2d 101 (1978).

■ The facts indicate that Appellant had argued with the victim in a Philadelphia bar. Appellant and four other persons then drove around for a short time, ultimately returning to the bar where Boykin was induced to approach the automobile. As Boykin bent down to look into a window, he was shot once, staggered away, but was shot a second time and died in

1. 18 Pa.C.S. § 2502.
2. 18 Pa.C.S. § 903.
3. 18 Pa.C.S. § 907.
4. 42 Pa.C.S. § 9711(d)(9), (10) and (11).

the hospital of two gun shots shortly thereafter.[5] Two eyewitnesses who were friends of the Appellant positively identified Jasper as the shooter and so testified at trial. (T.T., 3/15/88, pp. 100–115; 3/16/88, pp. 320–331). This evidence unquestionably meets the prescribed standard and would support the conviction for murder of the first degree.

## A. Challenge to Jury Selection

Appellant first asserts that the trial court erred in preventing him from interrogating venirepersons after they had expressed unbending opposition to capital punishment and stated that they would be unwilling and unable to impose the death sentence under any circumstances and irrespective of their obligation to follow the court's instructions. His argument is that somehow the jurors might have been "rehabilitated" and that he should have been afforded an opportunity on voir dire to accomplish that purpose before they were excused.

The trial record shows that the following venirepersons were excused for cause after questioning by the prosecution: Sharon Ellison (firmly opposed to the death penalty on religious grounds, T.T., 3/9/88, pp. 282–285); Bernice Bolden (unalterable religious opposition to the death penalty, T.T., 3/11/88, pp. 530–533); Doris Reimer (fixed opposition to capital punishment, T.T., 3/11/88, pp. 530–533): John McTanney (fixed opposition to death, T.T., 3/11/88, pp. 535–537); Mary Magee ("personal beliefs too strong" to impose death, T.T., 3/11/88, p. 631); Sophia Skiba (a nurse dedicated to preserving life and would not vote to take it, T.T., 3/11/88, pp. 645–647); Danielle Levin ("absolutely" would not impose a death sentence, T.T., 3/14/88, pp. 692–693); and Diana Freeman (distrust of police so strong that she would not follow the court's instructions, T.T., 3/10/88, pp. 364–365).

Appellant concludes that the exclusion for cause of prospective jurors from a panel because of their expressed views on capital punishment violated *Witherspoon v. Illinois*, 391 U.S.

---

5. Three of the persons in the car remain unidentified. A fourth testified at the preliminary hearing but was unavailable at trial and remains at large.

510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), *reh. denied,* 393 U.S. 898, 89 S.Ct. 67, 21 L.Ed.2d 186 (1968). The "Witherspoon doctrine" holds that jurors cannot be challenged for cause based on their *general* opposition to the death penalty; it must be made unmistakably clear that they would be unable to set aside their personal beliefs in deference to the law as required by their oath as jurors. As noted in *Commonwealth v. Peterkin,* 511 Pa. 299, 513 A.2d 373 (1986), *cert. denied,* 479 U.S. 1070, 107 S.Ct. 962, 93 L.Ed.2d 1010 (1987), *Witherspoon* has been refined by the United States Supreme Court.

> In its recent examination of the *Witherspoon* standard, the United States Supreme Court chose the test set forth in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), as preferable to the original standards of *Witherspoon.* See *Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The *Adams* test is whether the juror's views on capital punishment would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. *Adams, supra,* 448 U.S. at 45, 100 S.Ct. at 2526.

(511 Pa. at 311, 513 A.2d at 379). See also, *Commonwealth v. Lewis,* 523 Pa. 466, 567 A.2d 1376 (1989); and *Commonwealth v. Colson,* 507 Pa. 440, 490 A.2d 811 (1985).

The rule, therefore, is that venirepersons who are unable to perform their duties impartially and faithfully at the sentencing stage of the trial may be excused for cause. *Lewis, supra,* and *Commonwealth v. Hardcastle,* 519 Pa. 236, 546 A.2d 1101 (1988), *cert. denied,* 493 U.S. 1093, 110 S.Ct. 1169, 107 L.Ed.2d 1072 (1990), incorporating *Lockhart v. McCree,* 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). This includes prospective jurors who clearly express such antagonism to testimony by police that they will be prejudiced in the case.

In her opinion on post-trial motions, the trial judge summarized her decisions as follows (Trial court opinion, p. 17):

> We made each judgment to exclude these prospective jurors only after carefully and patiently listening to the views expressed by each potential juror. We listened and

watched their demeanor on the witness stand and made our judgment on credibility. After having done so, there was no necessity or reason to permit further repetitious inquiry by defense counsel in a vain hope that somehow one or more jurors would throw away or bend long-held, fixed views on such a passionate question. Any juror who claimed that by the miracle of additional questioning by defense counsel he or she had been "rehabilitated" would have been absurd. In any event, any professed retreat from the already expressed views would have been wholly unworthy of belief and, further, would have served no purpose other than allowing the Commonwealth to raise another challenge for cause. It is useless to engage in such colloquies once a juror has made it abundantly clear that his resolute opposition to capital punishment is fixed in all cases.

It must be noted that the Commonwealth, as the party seeking to remove the prospective juror for cause, has the burden of establishing the reason for removal. If the Commonwealth's questions are sufficiently precise and on point and the venireperson's answers are certain and unequivocal, it is certainly possible for the court to determine that cause has been shown such that further questioning is unnecessary. A trial judge has wide latitude in supervising the manner in which voir dire is conducted, including the power to prevent further voir dire when responses to death qualification questions prove that additional inquiry will be fruitless.[6] We are satisfied that the procedure and decisions of the court in

6. The Commonwealth also contends that as to venirepersons Reimer and Magee, Appellant waived any right to claim error by failing to object on the record. Appellant responds that any such gesture would be futile. Because our law firmly disposes of the issue of excludability on the merits, there is no reason to address the waiver problem. Our holding, therefore, would preclude raising the waiver issue under ineffective assistance of counsel as intimated by Chief Justice Nix's dissent in *Commonwealth v. Szuchon*, 506 Pa. 228, 484 A.2d 1365 (1984), which rested on *Witherspoon* and castigated defense counsel for not seeking to "rehabilitate" venirepersons opposed to the death penalty. *Id.*, 506 Pa. at 260, 484 A.2d 1365. We, nevertheless, affirm the rule that challenges to the selection of a jury can be waived by a failure to object appropriately. *Lewis*, 523 Pa. at 475, 567 A.2d at 1381.

excusing potential jurors was constitutionally firm in all respects. Appellant's challenge on this point is rejected.

### B. Insufficient Jury Instructions
### on Mitigating Circumstances

■■■ Appellant argues that the trial court erred at the penalty stage because it did not "offer guidance to the jury as to how to consider" the defense's evidence in mitigation.

As the factual basis of his assertion, he targets two circumstances in mitigation: evidence of good conduct in jail while awaiting this trial and participation in a leadership role in a class action prisoner litigation aimed at eliminating allegedly bad conditions for segregated prisoners. He readily admits, however, that both pieces of evidence were introduced without limitation to the penalty jury. His repetitious complaint, nevertheless, is that in "the case instantly (sic), the lower court allowed the evidence, but offered no guidance to the jury as to how it was to consider the evidence." (Appellant's Brief, p. 27).

His more specific meaning is that these two mitigating considerations are not enumerated as such, but arise generally under 42 Pa.C.S. § 9711(e)(8) (any other evidence of mitigation). He argues that the court was remiss in not instructing the jury that, although unenumerated, these considerations should have been given equal weight and quality as other mitigating circumstances.

He concludes that where "the proffered evidence is offered in mitigation of the penalty of death, the Supreme Court has consistently condemned the erection of barriers to the jury's full consideration of mitigating evidence." (Appellant's Brief, p. 30). In support of his claim, he marshalls the standard array of federal cases which embody the rules applicable to consideration of mitigating circumstances: *Skipper v. South Carolina*, 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1 (1986); *Eddings v. Oklahoma*, 455 U.S. 104, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982), and *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). Additionally, Appellant points to *Penry v. Lynaugh*, 492 U.S. 302, 109 S.Ct. 2934, 106 L.Ed.2d 256

(1989), and *Franklin v. Lynaugh,* 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988).

To the extent that Appellant employs these cases to prove his instant allegation, he is simply mistaken in his reading of them. All of the above precedents involved barriers to the unfettered freedom of a sentencer to consider any mitigating factors. *Lockett* and *Eddings* dealt with statutory limitations, while *Skipper* struck down an evidentiary ruling which precluded consideration of any mitigations.

*Franklin* and *Penry* ruled on state sentencing schemes, such as the Texas code, for example, which establishes a two-step system in imposing a death sentence wherein after all mitigating evidence is put in, the penalty jury is then required to answer affirmatively or negatively to "special issues" such as whether the jury firmly believes that the killing was deliberate (the so-called "residual doubt" issue) and that the defendant is a danger to society. Depending on the jury's response, the result could be either a death sentence or life in prison. The defendants in those cases argued on appeal that such systems act as a barrier to full consideration of the "independent effect" to be given to any submitted mitigating evidence in violation of *Lockett* and subsequent cases.

Those problems obviously have no relevancy to our statute, § 9711(e)(8). Typical of most American jurisdictions, Pennsylvania *requires* the jury to consider "any other evidence" in mitigation without any barriers whatsoever.

To seek to obligate a court, moreover, to specify to a jury that "anything" in mitigation must be an equal part of the other remaining enumerated mitigating circumstances is to engage in frivolous doubletalk. For in the most elementary and plain sense, "any other" is itself an enumerated consideration as the jury was instructed, and by "any other" we mean "any other" in any language which is spoken on the face of the earth, including especially ordinary English.

That is to say that our statutory scheme employs no tricks, gimmicks or barriers of any sort designed to frustrate the full presentation of mitigating evidence which is balanced against

aggravating circumstances by an unbound jury. And that is what took place on the record here. Tracking the language of the statute, a preferred method under *Commonwealth v. Frey,* 504 Pa. 428, 475 A.2d 700 (1984), *cert. denied,* 469 U.S. 963, 105 S.Ct. 360, 83 L.Ed.2d 296 (1984), the trial court instructed the jury as follows on the exact statutory language: "Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." (T.T., 3/20/88, p. 1017). We find no merit to this allegation.

C. Prejudice Arising from Wearing
Leg Shackles at Penalty Stage

▆▆▆ Appellant complains that he suffered reversible error by being forced to wear shackles on his ankles in front of the penalty jury.

The history of the trial shows that the guilty verdict was handed down on a Saturday. The penalty jury convened the following day, on a Sunday, when Philadelphia City Hall, wherein are located the criminal courtrooms, was closed and lacked normal staffing by police and sheriffs. The trial judge ordered the Appellant to be brought into the courtroom with leg shackles before the entrance of the jury and justified the order because of the potential for flight based on his past record as a fugitive and grave fears arising from Appellant's prior record for violence in the face of an empty building. (T.T., 3/20/88, pp. 835–838). Appellant was brought into the court room before the jury entered and placed behind the counsel table so that the jury could not see him shackled. The record reveals a controversy between defense counsel and the court as to whether the jurors could see Appellant's shackled feet under the counsel table.

▆▆▆▆ We observe at the outset that it is well-settled under common law and constitutionally as incident to a fair trial without prejudice that defendants appear free from shackles or other physical restraints. The sight of shackles and gags, moreover, constitutes an affront to the very dignity and decorum of judicial proceedings. *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). While there

exists a legal presumption against the necessity of physical restraint of an accused in the courtroom, there are exceptional circumstances when the employment of such techniques are an acceptable practice where such "restraint [is] reasonably necessary to maintain order." ABA Project on Minimum Standards for Criminal Justice, Standards Relating to Trial by Jury § 4.1(c) (Approved Draft 1968), as accepted in *Commonwealth v. Davis*, 466 Pa. 102, 351 A.2d 642 (1976).

Exceptional circumstances often have been found in sister jurisdictions as well where the defendant disrupts the proceedings, where there is evident danger of escape, and where the court has reason to believe that an unrestrained defendant might attack others. See, for example, *State v. Roberts*, 86 N.J.Super.Ct. 159, 206 A.2d 200 (1965); *State v. Glick*, 73 Or.App. 79, 697 P.2d 1002 (1985); *Burleson v. State*, (Tex. App.2d Dist.), 646 S.W.2d 646 (1983); *People v. Lundquist*, 151 App.Div.2d 505, 542 N.Y.S.2d 295, *app. den.* 74 N.Y.2d 849, 546 N.Y.S.2d 1014, 546 N.E.2d 197 (1989); *People v. Sheldon*, 48 Cal.3d 935, 258 Cal.Rptr. 242, 771 P.2d 1330 (1989); *People v. Stankewitz*, 51 Cal.3d 72, 270 Cal.Rptr. 817, 793 P.2d 23 (1990); and *Gray v. Commonwealth*, 233 Va. 313, 356 S.E.2d 157 (1987), *cert. denied*, 484 U.S. 873, 108 S.Ct. 207, 98 L.Ed.2d 158 (1987).

The most recent decision by our Superior Court on this subject approves the above rules but also holds on point that where the trial evidence shows that a violent defendant was incarcerated at the time of trial, no prejudice occurs even when restraints are visible to the jury. *Commonwealth v. Chew*, 338 Pa. Superior Ct. 472, 487 A.2d 1379 (1985) (appeal not filed in this case). We hold this to be a correct statement of the law.

Proper security measures are within the discretion of the trial court. *Commonwealth v. Patterson*, 452 Pa. 457, 308 A.2d 90 (1975). The exercise of that discretion under the facts of the instant case was neither abusive nor unwarranted. The trial court undertook an extensive scrutiny of the line of sight between the jury box and the defendant's seat but found

14

no validity to the complaints of defense counsel. The known violent criminal character of the accused, coupled to his record as a past fugitive, lends additional support to the court's decision. In *Chew, supra*, it was held also that an appellant who already had been convicted as a murderer by the same jury could not have been prejudiced at anytime or circumstances by that jury viewing the very person they had found guilty of a heinous crime then appear before them in restraints. We lastly find that the Appellant waived his claims to error by failing to question the jury on the subject of restraints or to ask for cautionary instructions. *Commonwealth v. Evans*, 465 Pa. 12, 348 A.2d 92 (1975). The allegation of prejudice is rejected.

### D. Use of F.B.I. Conviction Record

■■■ Appellant asserts a fourth error by contending that the trial court should not have permitted the use of a record of his previous crimes compiled by the Federal Bureau of Investigation to prove aggravating circumstances. He argues that the authentic individual court records alone constitute the proper record. We summarily dismissed the identical complaint in his first trial, *Commonwealth v. Jasper*, 526 Pa. 497, 510, n. 4, 587 A.2d 705, 712 n. 4 (1991).

The prior criminal record was introduced at the penalty phase by a special agent of the F.B.I., Robert Booth, who testified from a document prepared by the Bureau's Identification Division (T.T., 3/20/88, p. 890). The document is furnished for "Official Use Only" and is "regulated by law." Every criminal's arrest by whatever authority is reported to the Bureau's central repository by photograph, fingerprints, aliases, and type of crime. Each file is assigned a federal number.

While Appellant challenges the reliability of the "rap sheet" or "crimney" as it is commonly labelled, he does not dispute the accuracy of the record. The issue, of course, is whether the F.B.I. record qualifies as a Business Record under 42 Pa.C.S. § 6108(b):

## § 6108. Business records

**(a) Short title of section.**—This section shall be known and may be cited as the "Uniform Business Records as Evidence Act."

**(b) General Rule.**—A record of an act, condition or event shall, insofar as relevant, be competent evidence if the custodian or other qualified witness testifies to its identity and the mode of its preparation, and if it was made in the regular course of business at or near the time of the act, condition or event, and if, in the opinion of the tribunal, the sources of information, method and time of preparation were such as to justify its admission.

**(c) Definition.**—As used in this section "business" includes every kind of business, profession, occupation, calling, or operation of institutions whether carried on for profit or not.

Appellant insists that the F.B.I. compilation fails to satisfy (b) because there was no evidence as to how the information was assembled, the sources of the information, the method of preparation, and whether the information was prepared at or near the moment when the data were received (Brief, p. 23). He concludes that the document was untrustworthy as a business record in overcoming the hearsay rule.

The trial judge ruled the testimony to be admissible on three grounds. First, "this document is an official business record, kept in the ordinary course of the business of the F.B.I." (Trial court opinion, p. 32). Second, more accurately according to the court is its admissibility under 42 Pa.C.S. § 6109, the Uniform Photographic Copies of Business and Public Records as Evidence Act, which sanctions the admissibility of accurately reproduced copies of original records, citing for additional authority on this point to *McCormick, Evidence* (3rd Ed.1984) at p. 713. (Trial court opinion, pp. 29–32). Third, the court pointed out that the prosecution did offer the testimony of the Clerk of Quarter Sessions in Philadelphia to prove Appellant's prior conviction for murder in the first degree in 1986. In this last regard, the trial court opinion (at p. 28, n. 6) notes that the Appellant himself put into evidence his own imprisonment in a federal conviction. On these bases, the court held that "we decline to require a

prosecutor to bring in clerks and official court records from all over the country" (Trial court opinion, p. 33).

We conclude that the evidence was introduced as a business record offering competent proof of the matters asserted in them. Agent Booth testified that the record was compiled in the regular course of business by a law enforcement authority. There is nothing on the record to demonstrate to any degree that the F.B.I. document was unreliable regarding the sources of information and method and time of preparation so as to make the information inadmissible.

██ Providing that the evidence meets the standards of the Act and is otherwise admissible, the trial court has discretionary power as to the acceptability of business records. *Henderson v. Zubik*, 390 Pa. 521, 136 A.2d 124 (1957). On point, moreover, is our opinion in *Commonwealth v. Graver*, 461 Pa. 131, 334 A.2d 667 (1975), which decided that permanent police logs compiled from police reports are business records and properly admissible by a record custodian who lacked knowledge of the criminal acts or who placed them in the log:

> Appellant is simply incorrect in his contention that the custodian did not know what information the maker had, where he got such information and the circumstances under which it was made. Indeed the custodian testified from the logs which recorded the sources of the information, what those sources knew and what action they took, and that the log was compiled each day from daily police reports.

461 Pa. at 139, 334 A.2d at 672. This applies directly to the instant case, as does the following statement from *McCormick, supra,* at p. 874 (footnotes omitted):

> Under the common law exception, the entries were required to be "original" entries and not mere transcribed records or copies. This was based on the assumption that the original entries were more likely to be accurate than subsequent copies or transcriptions. In business practice, however, it is customary for daily transactions such as sales or services rendered to be noted upon slips, memorandum books or the like by the person most directly concerned, and for someone

else to collect these memoranda and from them make entries into a permanent book such as a journal or ledger. In these cases, the entries in the permanent record sufficiently comply with the requirement of originality. They would certainly be admissible if the slips or memoranda disappeared, and should, it seems, be admissible as the original permanent entry without proof as to the unavailability of the tentative memoranda.

We find no merit to Appellant's claim of error on this issue.

■ Finally, under our statutory duty to review death cases to determine whether the imposed sentence of death is "excessive or disproportionate to the penalty imposed in similar cases," according to 42 Pa.C.S. § 9711(h)(3)(iii), we have conducted an evaluation of all convictions of murder of the first degree prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S. § 9711. We have reviewed the data and information pertaining to similar cases that have been compiled by the Administrative Office of Pennsylvania Courts (AOPC) pursuant to this Court's directive as enumerated in *Commonwealth v. Frey*, 504 Pa. 428, 475 A.2d 700 (1984). We find that the sentence of death is not excessive or disproportionate to the penalty imposed in similar cases, 42 Pa.C.S. § 9711(h)(3)(iii). We also find that the evidence supports the finding of an aggravating circumstance specified in subsection (d), 42 Pa.C.S. § 9711(h)(3)(ii), and that the sentence was not the product of passion, prejudice or any other arbitrary factor, 42 Pa.C.S. § 9711(h)(3)(i).

The judgment of sentence is affirmed.[7]

CAPPY, J., files a concurring opinion in which NIX, C.J., joins.

CAPPY, Justice, concurring.

I concur in the result reached by the majority in affirming the conviction of first degree murder and the judgment of

7. The Prothonotary of the Supreme Court is directed to transmit the full and complete record of the trial, sentencing hearing, imposition of sentence, and review by this Court to the Governor. 42 Pa.C.S. § 9711(i).

sentence of death. I write separately to address two questions regarding the decision of the trial judge to shackle the defendant during the penalty phase of the proceedings.

First, I wish to note my extreme distaste for the practice of shackling, in the presence of the jury, an individual who has been accused of a crime. *See, Illinois v. Allen*, 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353 (1970). However, due to the specific nature of the individual involved, the surrounding circumstances and the significant precautions taken by the trial judge to ensure that the jurors were unaware of the shackles, I cannot find that the judge abused her discretion in this particular case. In reaching her decision the trial judge made the following observations:

> [W]e deemed such an action to be absolutely essential due to the fact that it was a Sunday; City Hall was closed; there were no other courtrooms operating; the building was in no sense secure and was not staffed by police or sheriffs. We were gravely concerned about the potential for an escape attempt by the defendant, especially since he had now been convicted of his second crime of murder in the first degree; he was in violation of his federal parole; and he was facing the possibility of a second sentence of death. We were well aware of Jasper's complete criminal history, including his many episodes of violent conduct, plus the fact that the defendant had made a career of fleeing.

After finding it necessary to shackle the defendant, the court went to great lengths to ensure that the jurors were unaware of that fact. The defendant was brought into the courtroom before the jurors and the restraints were attached so that they could not be seen from any seat in the jury box. Thus, as the jury was completely unaware of the precautions taken by the court, no prejudice could possibly fall to the defendant by this action.

Second, although I concur in the majority's finding that no prejudice occurred because of the shackles, I do not agree that the defendant waived his right to claim error on this point by failing to question the jurors or request a cautionary instruction. As I have just pointed out, the trial court went to great

lengths to ensure that the shackles could not be seen by the jurors. Counsel would have been creating greater prejudice to his client by bringing the shackles to the attention of the jurors and then asking if they were influenced by the presence of the defendant so shackled. It would have been equally damaging to request a cautionary instruction under the circumstances. Counsel clearly made his objection to the shackles known at the time, and that was sufficient to preserve the issue for appellate review. *Commonwealth v. Lewis,* 528 Pa. 440, 598 A.2d 975 (1991).

NIX, C.J., joins this concurring opinion.