J-S02018-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| ANTHONY WILLIAMS | : | |
| | : | |
| Appellant | : | No. 1249 EDA 2020 |

Appeal from the Judgment of Sentence Entered February 6, 2020,
in the Court of Common Pleas of Lehigh County,
Criminal Division at No(s): CP-39-CR-0001093-2019.

BEFORE: BENDER, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY KUNSELMAN, J.:                    Filed: May 27, 2021

Anthony Williams appeals, *pro se*, from the judgment of sentence imposed following his conviction for receiving stolen property.[1] We affirm.

The trial court set forth the relevant factual and procedural history as follows.

> The Whitehall Township Police received a report of a break-in on February 4, 2019. Homeowners discovered that their home, located at 3118 S. Ruch Street, Whitehall, Lehigh County, was burglarized. The victims, Steven and Samantha Rothdeutsch, reported the incident to police upon their discovery and informed police the break-in must have occurred while they were away during the daytime hours between 8:15 a.m. and 5:30 p.m. Stolen items included an Apple MacBook Pro, a Nikon model 05300 camera, and various jewelry. Lieutenant James Lucas and Sergeant Mark Mazzitelli of the Whitehall Township Police Criminal-Investigative-Division began an investigation. A few days later, on February 6, 2019, the victims relayed that they had located an Apple MacBook Pro being sold on Craigslist.org, which

---

[1] 18 Pa.C.S.A. § 3925(a).

they believed to be their stolen property.  On that same day, Det. Mazzitelli discovered that a Nikon model 05300 camera had been sold to Pawn America located at 923 Hamilton Street in the city of Allentown.

Pawn America records showed that the Nikon camera was sold by . . . Williams on the same day as the break-in on February 4, 2019.  When [Williams] pawned [the camera,] he was required to provide identification and [his] photo was taken at the time of the sale.  Det. Mazzitelli confirmed that the camera sold at Pawn America matched the serial numbers of the missing camera. During the trial, the court noted that [Williams] remarked to the jury that the picture taken by Pawn America of him was a beautiful picture.

Det. Mazzitelli, shielding his identity, contacted the seller of the Apple MacBook Pro through Craigslist.org and arranged a purchase to initiate a buy-bust operation.  Det. Mazzitelli was in contact with the seller multiple times.  An arrangement was made to meet at Dunkin Donuts, located at the intersection of MacArthur Road and Jordan Parkway, to complete the transaction.  Lt. Lucas and other officers traveled with Det. Mazzitelli to provide assistance.

On February 6, 2019, at approximately 5:05 p.m., [Williams] arrived at Dunkin Donuts in his black 2010 Dodge Journey.  [Williams] was immediately detained.  [Williams] was informed that he was being arrested for the stolen merchandise. Lt. Lucas testified that [Williams] began to make statements and offer explanations.  Lt. Lucas interrupted [Williams] and said he would speak with him back at headquarters, but if he was going to continue to talk, then he would need to provide [Williams] with his ***Miranda***[2] warnings.  [Williams] continued and Lt. Lucas ***Mirandized*** [Williams] verbally while standing in the Dunkin Donuts parking lot.  . . .

* * * *

[Williams] was not provided with a written form on scene to waive his ***Miranda*** rights.  [Williams] informed police that the item he wished to sell, the Apple MacBook Pro, was located in his

---

[2] ***Miranda v. Arizona***, 384 U.S. 436 (1966).

vehicle. Police asked permission to retrieve the computer and [Williams] gave consent. The computer was recovered from the front passenger seat and matched the serial number of the missing computer. Upon retrieving the laptop, the police asked for further permission to search the vehicle. [Williams] gave additional permission to search his car. [Police observed a crowbar and gloves in Williams' vehicle.] In an abundance of caution the police also obtained a search warrant to search the vehicle. [Williams] was transported back to Whitehall Township Police Headquarters.

At headquarters, [Williams] was audio and video recorded and consented to an interview with police. [Williams] wanted to speak with police and the police recall that he was very talkative. Before the interview, [Williams] admitted (1) he was provided with his rights, (2) stated that he did not wish to go over his rights again, and (3) informed police he understood his rights. This occurred less than an hour after Lt. Lucas provided [Williams] with *Miranda* warnings on scene. Ultimately, [Williams] admitted to his involvement in the burglary of the residence at 3118 S. Ruch Street.

[Police charged Williams with several offenses, but later withdrew all charges other than receiving stolen property. Williams filed a counseled omnibus pretrial motion seeking to suppress the statements he made to police, as well as information that police obtained from his phone. Following a hearing, the trial court denied suppression.]

At trial, [Williams elected to represent himself with the public defender acting as stand-by counsel. Williams] took the stand to testify in his defense. [Williams] informed the jury about his life and upbringing and introduced past contact with authority and police. [Williams] explained his previous experiences with police and how that shaped him. [Williams] readily admitted to the jury that he told police multiple stories and then attempted to explain why he lied to police. [Williams] informed the jury that he was convicted of burglary in the past but that is not the type of individual he is anymore. [Williams] had the opportunity to tell the jury about books that he had written and published and a business that he started. [Williams] portrayed himself as a businessman selling things to different people online. [Williams] attempted to portray a persona of a newly reformed law-abiding

citizen. He testified that he works helping people and that he works hard.

[Williams'] testimony about the incident in question appeared somewhat disorganized but appeared to the court as another admission. [Williams] admitted that he was at the scene of the burglary while with his friend "G." [Williams] was driving with "G" as a passenger when they stopped in the victim[s'] neighborhood to pass out flyers. [Williams] noticed that "G" was bringing items out of a home to his car. At some point, he noticed firearms in his vehicle under a blanket and saw "G" coming out of the house with a television. [Williams] testified that he rebuked his friend and had his friend take the firearms back into the house. [Williams] swore he didn't touch anything and left. At some later time, his friend "G" gave [Williams] a sob story and told him how he needed money. Apparently, "G" gave [Williams] the camera and laptop to sell so that he could help him make some money. [Williams] informed the jury that he would have no reason to think that the camera and laptop given to him by "G" were stolen.

The court provided significant leeway to [Williams'] testimony over the objection of the Commonwealth. However, the court did make some attempts to curtail prolonged stories and/or experiences that were irrelevant.

Trial Court Opinion, 7/22/20, at 3-6 (headings, original footnotes, and unnecessary capitalization omitted, footnote added)

At the conclusion of trial, the jury convicted Williams of receiving stolen property. On June 2, 2020, the trial court sentenced Williams to serve three to seven years in prison. Williams filed a timely *pro-se* post-sentence motion which the trial court denied. Williams thereafter filed a timely *pro se* notice of appeal. Both Williams and the trial court complied with Pa.R.A.P. 1925.

In his *pro se* brief, Williams raises the following issues for our review.

1. Did the lower court error [*sic*] in not suppressing the videotape interview and phone records?

2. Did the trial judge abuse her discretion in denying [Williams'] right to show reasonable doubt as to an element of the crime, thereby denying [Williams his] constitutional rights of due process and the confrontation clause?

3. Did the lower court abuse its discretion in denying [Williams] the right to use evidence to support his testimony?

4. Did the judge's remarks concerning the prosecutor's character show favor to one side and thus prejudice [Williams], thereby denying [Williams] a fair trial?

5. Was the multiple remarks and discussions by the trial judge both in front of and outside the jury a showing of partiality of the judge and a denial of a fair and impartial trial?

6. Was [Williams] denied his constitutional right to a fair trial by uniform [*sic*], armed Sheriff deputies positioning around him during his questioning of witnesses and though out [*sic*] trial?

7. Was [Williams] denied due process in violation of [Pa.R.Crim.P.] 704?

Williams' Brief at vii (issues reordered for ease of disposition).

Williams initially challenges the trial court's denial of his motion to suppress the videotaped interview and phone records. In reviewing an appeal from an order denying suppression, our standard of review is limited to determining:

whether [the trial court's] factual findings are supported by the record and whether [its] legal conclusions drawn from those facts are correct. When reviewing the rulings of a [trial] court, the appellate court considers only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. When the record supports the findings of the [trial] court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*Commonwealth v. Griffin*, 116 A.3d 1139, 1142 (Pa. Super. 2015). Our scope of review is limited to the evidence presented at the suppression hearing. *In re interests of L.J.*, 79 A.3d 1073, 1088-89 (Pa. 2013).

Generally, statements made during custodial interrogation are presumptively involuntary, unless the accused is first advised of his *Miranda* rights. *Commonwealth v. DiStefano*, 782 A.2d 574, 579 (Pa. Super. 2001). Under *Miranda*, police officers are required to apprise suspects prior to questioning that they have the right to remain silent, that any statement made may be used against them, and that they have the right to an attorney. *Miranda*, 384 U.S. at 444. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id*. As our Supreme Court has explained

> The determination of whether a confession is voluntary is a conclusion of law and, as such, is subject to plenary review. Moreover, the totality of the circumstances must be considered in evaluating the voluntariness of a confession. The determination of whether a defendant has validly waived his *Miranda* rights depends upon a two-prong analysis: (1) whether the waiver was voluntary, in the sense that defendant's choice was not the end result of governmental pressure, and (2) whether the waiver was knowing and intelligent, in the sense that it was made with full comprehension of both the nature of the right being abandoned and the consequence of that choice.

*Commonwealth v. Mitchell*, 902 A.2d 430, 451 (Pa. 2006).

In assessing voluntariness, a court should look at the following factors: (1) the duration and means of the interrogation; (2) the physical and psychological state of the accused; (3) the conditions attendant to the

detention; (4) the attitude of the interrogator; and (5) any and all other factors which could drain a person's ability to withstand suggestion and coercion. **See Commonwealth v. Nester**, 709 A.2d 879, 882 (Pa. 1998). The Commonwealth bears the burden of proof and must demonstrate that the proper warnings were given, and that the accused manifested an understanding of these warnings. **Commonwealth v. Eichinger**, 915 A.2d 1122, 1136 (Pa. 2007).

Williams argues that, at the time he initially encountered police, it was cold, dark, and raining, and the Dunkin Donuts parking lot was located on the side of a highway at rush hour. Williams claims that these circumstances caused him to talk excessively. He additionally claims that two of the officers continued to ask him questions while Lt. Lucas provided him with **Miranda** warnings. Williams contends that, because he was talking excessively and the other officers were directing questions at him, he did not hear the full **Miranda** warnings given by Lt. Lucas. He claims that, had he heard his **Miranda** rights, he would have exercised them.

Williams further argues that the trial court abused its discretion by ruling that Williams' waiver of his **Miranda** rights was valid. According to Williams, in his prior encounters with law enforcement, he was read his **Miranda** rights and thereafter signed a written **Miranda** waiver. He asserts that no such written **Miranda** waiver was obtained in this case. Williams contends that police could have provided him with additional **Miranda** warnings when they

arrived at the police station, but they failed to do so. Williams also states that, as a condition of parole, he is required to waive certain rights, and at the time he encountered police at the Dunkin Donuts, he thought his right to remain silent was a right that he had waived by being on parole. Williams asserts that, due to the fact that he did not hear the initial ***Miranda*** warnings, the subsequent interrogation was unconstitutional and should have been suppressed. Williams further asserts that the trial court should have suppressed the phone records on the basis that they constitute fruit of the poisonous tree.

The trial court concluded that Williams' suppression challenges lacked merit. The court reasoned:

> Here, when the police arrested [Williams] in the parking lot of Dunkin Donuts he began to immediately offer explanations and make statements. Lt. Lucas testified that he had to interrupt [Williams] to provide ***Miranda*** warnings. Contrary to common belief, ***Miranda*** warnings are only required prior to custodial interrogation. ***See Com. v. Sites***, 427 Pa. 486, 492, 235 A.2d 387, 390 (1967). Spontaneous or volunteered statements are not protected and are admissible without warning. ***See Com. v. Baez***, 554 Pa. 66, 85, 720 A.2d 711, 720 (1998). We find the testimony from the police that he was provided with ***Miranda*** on scene credible in light of police practice and procedure. It seems apparent to this court that [Williams] began to offer spontaneous explanations and the police orally provided ***Miranda*** (which he acknowledges) to protect any evidence rather than leave the statements open to scrutiny. The police practiced similar procedure when they obtained a search warrant even though they had [Williams'] permission to search the vehicle.
>
> At the pretrial [suppression] hearing, [Williams] acknowledged police partially informed him about his ***Miranda*** rights but claims police left out information regarding his right to counsel. After a review of the taped interview, we found that

- 8 -

Detective Mazzitelli reiterated his right to counsel during the interview and [Williams] still "wanted to be honest and wanted to talk." We are mindful that [Williams] is no stranger to the criminal justice system with a lengthy criminal history. This was apparent throughout the interview and further supports [Williams'] acknowledgments that he was aware of and understood his rights. *See Com. v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003) (defendant's twice stating he understood his *Miranda* rights, and answering questions thereafter, sufficiently manifested the intent to waive his rights).

Therefore, it is clear from the testimony taken at the pretrial [suppression] hearing and the video and audio recording of the interview that [Williams] was not under the influence of any substances or alcohol, that he was aware of his *Miranda* warnings, and that he waived those rights knowingly and intelligently. However, similar to *Cohen*, [53 A.3d 882 (Pa. Super. 2012),] we would emphasize that the best practice is for police officers to obtain written confirmation that a defendant understands his *Miranda* rights prior to interrogation. Although not legally required it would help eliminate any such allegations. *See Com. v. Baez*, 2011 PA Super 109, 21 A.3d 1280, 1286 (2011) *citing **Com. v. Bomar***, 573 Pa. 426, 447, 826 A.2d 831, 843 (2003) (neither oral confirmation nor written waiver is a prerequisite for finding that a defendant has expressly waived his or her *Miranda* rights).

Trial Court Opinion, 8/28/19, at 6-7 (unnecessary capitalization omitted).

Based on our independent review, we conclude that the totality of the circumstances establishes that Williams knowingly, intelligently, and voluntarily waived his *Miranda* rights. Lt. Lucas testified that, when police encountered Williams in the Dunkin Donuts parking lot and explained to him why he was being detained, Williams began to make statements and offer explanations. N.T., 7/30/19 at 20. Lt. Lucas interrupted Williams and said he would like to get out of the rain and would speak with Williams back at headquarters. *Id*. However, Williams continued to offer unsolicited

explanations as to why he had the computer. *Id*. Lt. Lucas told Williams that if he continued to talk, Lt. Lucas would need to provide him with *Miranda* warnings since he was in custody. *Id*. When Williams continued to talk, Lt. Lucas verbally gave him *Miranda* warnings while standing in the Dunkin Donuts parking lot. *Id*. at 21. Lt. Lucas provided the following description of the *Miranda* warnings he provided to Williams:

> I basically gave him the *Miranda* warnings that I would usually give verbally, try to recite it exactly as I know it from our form. But it's basically, I wish to inform you that you have an absolute right to remain silent. That anything you say can and will be used against you in a court of law. You have the right to talk to an attorney before or have an attorney present with you during questioning. If you cannot afford to hire an attorney, one will be appointed to represent you without charge before questioning, if you so desire. If you do decide to answer any questions, you may stop at any time you wish. And then we add, do you understand these rights I explained to you? Which he acknowledged that he did. And I said, with these rights in mind, do you wish to talk to us? And he said he did.

*Id*. Lt. Lucas did not read the *Miranda* warnings from a card; however, he stated them from memory, having recited them hundreds, if not thousands of times. *Id*. at 22. Lt. Lucas testified that the verbal *Miranda* warnings he gave to Williams are exactly what he would have read from a form. *Id*. at 23, 24. Williams indicated to Lt. Lucas that he understood his *Miranda* rights, but still wished to speak with police. *Id*. at 24.

Detective Mazzitelli testified that he was present and heard Lt. Lucas verbally provide *Miranda* warnings to Williams in the Dunkin Donuts parking lot. *Id*. at 54. The detective further testified that the *Miranda* warnings

provided to Williams were as Lt. Lucas had described in his testimony. *Id*.

Detective Mazzitelli stated that, while at the police station he asked Williams

if police could record and videotape the interview, and Williams consented.

N.T., 8/2/19, at 8. When the detective activated the recording, he again asked

Williams for his consent to permit police to record the interview, and Williams

provided his consent on the recording. *Id*. at 9. As Detective Mazzitelli was

present when Lt. Lucas provided Williams *Miranda* warnings, the detective

noted on the recording that Williams had been given those warnings, and

asked Williams if he understood that the warnings still applied now that they

were at the police station. *Id*. Williams indicated on the recording that he

understood. *Id*. The detective reminded Williams that he had the right to

remain silent, and Williams responded that he was "fully aware of his rights."

*Id*. at 9-10.

When the detective asked Williams to confirm that he was still willing to

speak with police, Williams responded, "absolutely." *Id*. at 10. During the

interview, Williams consented to showing the detectives certain information

on his cell phone. *Id*. at 12-13. At no point during the interview did Williams

indicate that he wanted to stop talking to police. *Id*. at 14. At some point

the audio was turned off at Williams' request; and, when the audio was turned

back on, Detective Mazzitelli again reminded Williams that he did not have to

speak to police, that he had the right to remain silent and to speak with an

attorney, and that all the rights previously explained to him still applied. *Id*.

at 14-15. Williams again indicated that he understood, and still consented to speak to the police. *Id*. at 15.

Given the testimony of both Lt. Lucas and Detective Mazzitelli regarding the *Miranda* warnings they provided to Williams, and Williams' repeated indications to Lt. Lucas and Detective Mazzitelli that he was aware of his rights and understood them, we conclude that the suppression record amply supports the trial court's determination that Williams knowingly, intelligently, and voluntarily waived his *Miranda* rights. While the duration of the interrogation was lengthy (eight hours), we find no other factors which could drain a person's ability to withstand suggestion and coercion, nor does Williams allege any. *See Nester*, 709 A.2d at 882. The interview was not conducted in an unusual manner, and there is no suggestion of impairment or physical coercion. Moreover, based on the totality of the circumstances, Williams' claim on appeal that he did not hear the *Miranda* warnings provided by Lt. Lucas is contradicted by the fact that Williams told both Lt. Lucas and Detective Mazzitelli that he understood his rights but nevertheless wished to speak with police. Accordingly, Williams' first issue merits no relief.

In his second and third issues, Williams challenges evidentiary rulings made by the trial court. Before we address these claims, we must first determine whether Williams preserved them for our review. In order to preserve an evidentiary challenge for appellate review, a defendant must make a timely and specific objection to the evidentiary ruling. *See*

***Commonwealth v. Thoeun Tha***, 64 A.3d 704, 713 (Pa. Super. 2013) (holding that an appellant's failure to raise a contemporaneous objection to evidence at trial waives that claim on appeal); ***see also Commonwealth v. Baumhammers***, 960 A.2d 59, 73 (Pa. 2008) (holding that in order to preserve an issue for appellate review, a party must make timely and specific objection to ensure that the trial court has an opportunity to correct the alleged error); Pa.R.E. 103(a) (providing that an "[e]rror may not be predicated upon a ruling that admits or excludes evidence unless . . . a timely objection . . . appears of record"); Pa.R.A.P. 302(a) (providing that "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal").

In his second issue, Williams contends that the trial court abused its discretion by denying him the right to use certain evidence in support of his defense. Specifically, Williams challenges numerous rulings where the court sustained objections lodged by the prosecutor during Williams' cross-examination of the burglary victims and police officers. The first objection arose when Williams was questioning Mr. Rothdeutsch regarding the insurance claim for fifteen hundred dollars in repairs to a storm door that was damaged during the burglary. Williams questioned Mr. Rothdeutschs about each aspect of the claim for repairs to the door (*i.e.*, replacement of a glass pane, replacement of the door slab, stain and finish, *etc.*). ***See*** N.T., 2/4/20, at 122-125. The prosecutor objected on the basis of relevance. ***Id***. at 125-26.

Williams claimed that he was a handyman, and that the damaged glass pane of the door could have been replaced for sixty dollars. *Id*. at 126. The trial court sustained the Commonwealth's relevancy objection. However, Williams made no objection to the trial court's ruling. *Id*. at 126-27.

The second objection arose when Williams was questioning Mrs. Rothdeutsch regarding the timeframe in which the list of stolen items was compiled and sent to the insurance company (*i.e.*, one day or two days after the burglary). *Id*. at 163. The prosecutor objected on the basis of relevancy. *Id*. The trial court sustained the relevancy objection. However, once again, Williams made no objection to the trial court's ruling. *Id*. at 163-64.

Further objections occurred when Williams was extensively cross-examining Officer Michael Slivka regarding guns which were located in the Rothdeutsch residence, but were not taken during the burglary. The prosecutor twice objected based on relevancy. N.T., 8/5/20. At 37. The trial court sustained both objections, noting that the guns never left the home and Williams was not accused of having received them. *Id*. at 38-39. Williams made no objection to those rulings. *Id*. at 37-39.

The next objections occurred when Williams attempted to cross-examine Detective Mazzitelli regarding his initial search of Williams' vehicle and his preliminary suspicion that the crowbar and gloves found in the vehicle might be related to the burglary. The prosecutor objected on the basis of relevancy since Williams was not accused of, nor on trial for, the burglary. *Id*.

at 122-23.  The trial court sustained the objection.  However, Williams did not object to that ruling.  *Id*. at 123.  The prosecutor also objected when Williams later attempted to cross-examine Detective Mazzitelli regarding his analysis of the crowbar.  *Id*. at 215.  The trial court sustained that objection on the basis of relevancy.  Williams made no objection to that ruling.  *Id*.[3]

Here, Williams did not raise any objection to the trial court's evidentiary rulings he now challenges on appeal.  Consequently, he failed to preserve them for our review.  Thus, his second issue merits no relief.

In his third issue, Williams contends that the trial court abused its discretion in excluding from evidence twelve photographs that he sought to admit into evidence.  Specifically, Williams wanted to introduce photocopies of articles relating to police conduct in connection with the 1985 MOVE bombing in Philadelphia, Rodney King's 1991 beating by police in Los Angeles,

_____

[3] Williams also points to an exchange he had with the trial court in which he queried how he would ever be able to establish that no burglary had occurred when the court "restrained" his questioning of Commonwealth witnesses.  *See* N.T., 8/5/20, at 125-30.  In response, the trial court essentially suggested that, rather than trying to show that a burglary did not occur by casting doubt on the credibility of Commonwealth witnesses, perhaps Williams should consider presenting his own evidence or witnesses to establish that a burglary did not occur, but noting that Williams had no obligation to do so.  *Id*. at 125-26, 128-29.  However, no evidentiary ruling occurred in this exchange.  Nor did Williams raise any objection to the court's comments so as to preserve any alleged claim of error.  Similarly, Williams points to several instances when the trial court "interrupted" his cross-examination of Commonwealth witnesses, and claims that the court did so to disrupt his efforts to put on a proper defense.  Williams' Brief at 20.  Again, Williams did not raise any objection to those "interruptions" so as to preserve any claim of error.

the conviction and sentencing of the individual who murdered the Central Park jogger, and several photos of Williams. *See* N.T., 8/6/20, at 68-71. Williams claims that the photos show him helping ex-offenders, which was relevant to explain how he met "G." Williams also argues that the photocopies were relevant to show his state of mind at the time of his police interview, and why he provided police with a false confession. Williams further claims that the photos of him helping ex-offenders was relevant to his belief that he was helping "G" on the date of the burglary. Williams also challenges the trial court's ruling that certain checks paid by customers for his handyman services in 2018 and 2019 were inadmissible.

The trial court gave Williams ample opportunity to explain why the photographs were relevant to the case, but ultimately ruled that the photocopies were inadmissible. *Id*. at 71-73. Williams did not object to this ruling. *Id*. Similarly, when the trial court sustained the prosecutor's objection to the admission of checks paid in 2018 and 2019 by Williams' handyman customers, Williams failed to raise any objection. *Id*. at 84-85. As Williams failed to object to these evidentiary rulings, he failed to preserve them for our review. *See Thoeun Tha*, 64 A.3d at 713; *see also Baumhammers*, 960 A.2d at 73.[4] Thus, his third issue warrants no relief.

_____

[4] We found only one instance where Williams made an objection. After the trial court ruled that the photocopies were inadmissible, he asked if the photocopies could nevertheless be made part of the record. N.T., 8/6/20, at
*(Footnote Continued Next Page)*

In fourth issue, Williams contends that he was denied a fair trial due to comments made by the trial court regarding the prosecutor's character during jury instructions. Initially, we must determine whether Williams preserved this issue for our review.

In this Commonwealth, the failure to raise a timely and specific objection to the trial court's jury instructions will result in waiver of the claim on appeal. *See Commonwealth v. Neff*, 860 A.2d 1063, 1071 (Pa. Super. 2004); *see also* Pa.R.Crim.P. 647(C) (providing that "[n]o portions of the charge . . . may be assigned as error, unless specific objections are made thereto before the jury retires to deliberate).

Similarly, a party seeking recusal or disqualification on the basis of judicial bias or impartiality "must raise the objection at the earliest possible moment, or that party will suffer the consequence of being time barred." *Commonwealth v. Stafford*, 749 A.2d 489, 501 (Pa. Super. 2000) (citation and internal quotation marks omitted). The failure to timely move for a judge's recusal after the facts allegedly establishing bias come to a defendant's attention renders the judicial bias claim waived. *See Commonwealth v. Johnson*, 719 A.2d 778, 790 (Pa. Super. 1998)

---

67. The trial court granted his request. *Id*. Williams then objected to *that* ruling. *Id*. at 68. Notably, Williams has not raised any claim of error regarding that ruling.

Instantly, the record reflects that Williams did not raise any objection to the trial court's instructions in the court below. Nor did Williams move for recusal of the trial court judge based on judicial bias or impartiality. Thus, because Williams failed to raise his claim of judicial bias at the earliest possible opportunity, it is waived. *Id*.; *see also* Pa.R.A.P. 302(a).[5] Therefore, his fourth issue warrants no relief.

In his fifth issue, Williams claims that he was denied a fair trial because of comments made by the trial court both in and out of the presence of the jury which reflected bias toward the prosecution. In making this claim, Williams points to many of the unchallenged evidentiary rulings previously addressed and determined to be waived. Williams additionally points to a lengthy exchange he had with the trial court regarding the proper process and procedures to be used when showing witnesses photographs and admitting them into the formal evidentiary record. *See* N.T., 2/4/20, at 188-204. At one point, the judge became so frustrated at having to explain something

_____

[5] Williams concedes that he did not object to any of the trial court's comments, but nevertheless claims that the issue is not waived pursuant to *Commonwealth v. Hammer*, 494 A.2d 1054 (Pa. 1985) (holding that the failure of trial counsel to object to questioning of a testifying defendant by the judge will not, under all circumstances, render the allegation of judicial impropriety unavailable for appellate review). Here, unlike in *Hammer*, the trial court did not participate in the examination of a testifying defendant (*i.e.*, Williams). Nor does Williams allege that the trial court expressed an opinion regarding *his* credibility or the plausibility of the events *he* related. *Id*. at 1061. Thus, *Hammer* is factually and legally distinguishable.

three times to Williams that she began yelling, noting that Williams was driving her "insane." *Id*. at 203. *See* N.T., 8/4/20, at 203-04.

Williams also points to the trial court's ruling to sustain an objection made by the prosecutor when Williams asked Mr. Rothdeutsch if he was a police officer or had any connection with the police. N.T., 8/4/20, at 117. Williams further points to an admonition by the trial court that Williams refrain from testifying while cross-examining witnesses. N.T., 8/5/20, at 138.

Williams additionally points to an exchange that took place outside the presence of the jury when he attempted to make an offer of proof as to why he wanted to call Officer Lyndsay Yetter as a witness. *Id*. at 187-192. Williams indicated that he intended to elicit testimony from Officer Yetter that the Rothdeutchs' home did not look like a normal burglary scene because the burglar left items of value behind. *Id*. at 191. The court indicated that, while Williams could direct questions to Officer Yetter, the prosecution could object to those questions at the appropriate time. *Id*. at 191-92. The trial court additionally stated that she wondered why Williams did not take the prosecutor's offer for a plea, and noted that he was "a guy who's dragging the Commonwealth, the jurors, the judge, and everybody else through some kind of alternate universe." *Id*. at 192.

Williams next points to a comment made by the court to the prosecutor when making a ruling in Williams' favor, recalling that

> [t]here's a certain person, and I shall not say who, who said, you know, Judge, part of what Mr. Williams does is he pushes it,

- 19 -

pushes it, pushes it until a person gets so frustrated that they throw their hands up in the air and give him exactly what he wants because he's just pushing and pushing and pushing. And do you know what? It worked. Congratulations. It won't happen again. Let's go.

*Id*. at 207-08.

Williams next points to the trial court's interjection, during Williams' cross-examination of a Commonwealth witness, to inquire of the witness as to whether there was any indication on the document being discussed as to who input the information. *Id*. at 230.

Williams points to another interruption by the trial court of his cross-examination of a police officer, when the trial court asked the witness three questions in an apparent effort to move the questioning along. *Id*. at 299-300.

Williams claims that the trial court "testified" on the third day of trial, citing pages thirty-nine to sixty-four of the notes of testimony. Our review reveals, in those pages of the transcript, Williams was cross-examining Detective Mazzitelli. At times, the trial court interjected to clarify certain points, correct documentation, or to ask the detective questions in order to facilitate proper questioning. *See* N.T., 8/6/20, at 39-64.

Williams claims that the trial court also disrupted his testimony and bullied him on several occasions. Williams Brief at 23 (citing N.T., 8/6/20, at 65, 66, 81, 82, 84, 85). Our review of these portions of the transcript reflects that Williams wanted to introduce certain photocopies, including the

aforementioned articles relating to police conduct in connection with the 1985 MOVE bombing in Philadelphia, Rodney King's 1991 beating by police in Los Angeles, the conviction and sentencing of the individual who murdered the Central Park jogger, and several photos of Williams. *See* N.T., 8/6/20, at 68-71. The trial court gave Williams ample opportunity to explain why the photographs were relevant to the case, but ultimately ruled that the photocopies were inadmissible. *Id*. at 71-73.

The other portions of the transcript to which Williams refers concerns the trial court's comments while he was testifying. *Id*. at 81-85. At one point, the prosecutor objected to Williams testimony regarding an event which occurred when he was ten years old, and the trial court admonished Williams to "rein it in." *Id*. at 81. The prosecutor also objected when Williams began to tell the jury about a book he had written called "A Guide to the Supreme Life" which he had written in connection with a company he founded, called Supreme Life Consultants. *Id*. at 83. The trial court directed Williams to "advance the story a little bit." *Id*. The trial court also sustained the prosecutor's objection when Williams sought to admit copies of checks paid by customers for whom he provided handyman services in 2018 and 2019. *Id*. at 84-85.

In each of these instances wherein Williams claims that the trial court interrupted him, disrupted his case, or bullied him, he failed to raise any objection or request recusal. Thus, Williams has waived any claim of error

regarding these comments and rulings. **See Stafford**, 749 A.2d at 501; **see also Johnson**, 719 A.2d at 790. Thus, his fifth issue entitles him to no relief.

In his sixth issue, Williams claims that he was denied a fair trial due to the presence of uniformed sheriff's deputies beside him in the courtroom. He asserts that two or three deputies sat or stood less than a foot away from him at all times throughout the trial. Williams notes that he placed an objection on the record, asserting that the close proximity of uniformed deputies would cause the jury to perceive him as dangerous.

"[I]t is well-settled under common law and constitutionally as incident to a fair trial without prejudice that defendants appear free from shackles or other physical restraints." **Commonwealth v. Jasper**, 610 A.2d 949, 955 (Pa. 1992). Nevertheless, there are exceptional circumstances when the employment of such techniques is an acceptable practice where such "restraint [is] reasonably necessary to maintain order." **Id**. Exceptional circumstances have been found where the court has reason to believe that an unrestrained defendant might attack others. **Id**.

Here, Williams does not allege that he was handcuffed or shackled in the jury's presence. Instead, he complains only that uniformed sheriff's deputies were near him at all times throughout the trial. Our research has revealed no case law that would prohibit a defendant from merely being flanked by uniformed deputies throughout trial. Moreover, the trial court explained that "the Sheriff's Department was on alert during the trial

regarding the safety of the courtroom due to [Williams'] own actions that flagged him as a safety risk. While [Williams] was awaiting trial in in the Lehigh County Jail[,] he was charged with Felony Aggravated Assault for allegedly attacking a correctional officer." Trial Court Opinion, 7/22/20, at 11. Thus, exceptional circumstances clearly warranted the presence of sheriff's deputies near Williams throughout the trial. Accordingly, Williams' sixth issue merits no relief.

In his seventh issue, Williams claims that dismissal is warranted because his sentencing was delayed in violation of Pa.R.Crim.P. 704. Rule 704 provides that, "[e]xcept as provided by Rule 702(B), sentence in a court case shall ordinarily be imposed within 90 days of conviction . . .." Pa.R.Crim.P. 704(A)(1). When reviewing a trial court's order disposing of a motion to dismiss pursuant to Pa.R.Crim.P. 704:

> [W]e defer to the trial court's judgment on this issue of alleged undue delay and shall reverse only for an abuse of discretion. We have long held that mere errors in judgment do not amount to abuse of discretion; instead, we look for manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous. In addition, a trial court abuses its discretion if the law is overridden or misapplied.
>
> * * * *
>
> [O]ur scope of review is limited to the evidence on the record of the Rule 704 evidentiary hearing and the factual findings of the trial court. Also, we must view the facts found in the light most favorable to the prevailing party.

*Commonwealth v. Neysmith*, 192 A.3d 184, 192-93 (Pa. Super. 2018) (internal citations and quotation marks omitted).

The appropriate remedy for a Rule 704 violation without good cause is discharge; however, the fact that a defendant is sentenced more than ninety days after conviction is only the first step in determining whether discharge is appropriate. *Commonwealth v. Diaz*, 51 A.3d 884, 887 (Pa. Super 2012) (construing Pa.R.Crim.P. 1405, which was replaced by Rule 704). A defendant who is sentenced in violation of Rule 704 is entitled to discharge only where the defendant can demonstrate that the delay in sentencing caused prejudice. *Id*. Prejudice should not be presumed by the mere fact of an untimely sentence. *Id*. Instead, the trial court should consider: (1) the length of the delay falling outside of the 90-day period; (2) the reason for the improper delay; (3) the defendant's timely or untimely assertion of his rights; (4) any resulting prejudice to the interest protected by his speedy trial and due process rights. *Id*. The court should examine the totality of the circumstances, as no one factor is necessary, dispositive, or of sufficient importance to prove a violation. *Id*.

Williams points out that he was convicted on February 6, 2020, and sentencing was initially scheduled for March 27, 2020. However, his sentencing date was continued on two occasions, and he was not sentenced until June 2, 2020, at which time he was sentenced via video. Williams does not contest the period from March 17, 2020, to April 3, 2020, due to a judicial emergency brought on by the COVID-19 pandemic. However, he claims that, excluding this time frame, he was not sentenced until ninety-nine days after

his conviction. Williams claims that he requested to be sentenced *via* video on April 16, 2020, but that request was denied. He argues that there is no reason why he could not have been sentenced *via* video on his original sentencing date of March 27, 2020.

Williams additionally claims that, due to the delay in his sentencing, he was unable to file an appeal or request bail pending appeal. He additionally claims that he had to remain in the "hole," and was unable to join the general prison population. Williams' Brief at 34. Williams further claims that, because he was unable to request bail, he was unable to help family members during the COVID-19 pandemic, which caused Williams high anxiety requiring psychotropic medication.

Williams also claims that unidentified individuals have come forward and would testify that they were present when "G" came home with the stolen property and heard Williams agree to take the items to the pawn shop to help "G." Williams' Brief at 34. Williams claims that the delay in sentencing has prejudiced him because those individuals could be dead or incarcerated by the time he gets a new trial.[6] He further posits that the Rothdeutschs' insurance company "which has the evidence of exactly what was allegedly stolen could loose [sic] or go out of business by the time [Williams] come[s] back, in the

_____

[6] Williams also claims these facts support an after-discovered evidence claim. Williams' Brief at 33. Because Williams did not raise this claim below, it is waived. **See generally**, Pa.R.A.P. 302(a), **supra**.

event of a new trial." *Id*. at 35. He claims that such an event would impair his defensive theory that no burglary occurred, and the Rothdeutschs committed insurance fraud.

The trial court considered Williams Rule 704 challenge and determined that it lacked merit. The court reasoned as follows:

> On March 16, 2020, a week before [Williams'] scheduled sentencing date, the Supreme Court of Pennsylvania declared a statewide judicial emergency due to COVID-19. This statewide emergency was extended and maintained on March 18, March 24, April 1, April 28, and May 27, 2020 to a final extension date of June 1, 2020. Our Supreme Court established guidelines including priorities for the performance of critical court functions and ensuring the parties rights are protected which included: election matters, emergency bail review, *Gagnon I* hearings, juvenile delinquency detention, bench warrant hearings, temporary protection from abuse orders, emergency petitions for child custody, emergency petitions for guardianship, civil mental health reviews, emergency equity civil matters, and any pleading or motion relating to the public health concerns involving immediate and irreparable harm. [Williams'] sentencing was not listed as a priority and was not considered by this court to be one. The court was aware that [Williams'] faced significant guidelines of incarceration and that he would not be prejudiced as he was awaiting another trial in a separate assault case before this court.
>
> [Williams] was sentenced on June 2, 2020, to a period of incarceration of 3-7 years conducted *via* Zoom in accordance with the court's schedule in light of the pandemic. The court finds the pandemic of COVID-19 and subsequent state-wide judicial emergency to be good cause for the minor setback in his sentencing date.

Trial Court Opinion, 7/22/20, at 11-12 (footnote and unnecessary capitalization omitted).

We discern no abuse of discretion by the trial court in concluding that Williams' sentencing was delayed for good cause. Williams' original

sentencing date was scheduled at a time when our nation was just beginning to grapple with a global pandemic caused by COVID-19. Emergency measures dictated that all sentencing be deferred until adequate and appropriate safety measures could be implemented for inmates as well as for court staff and personnel. Moreover, the length of the delay falling outside of the 90-day period was minimal. Williams was sentenced ninety-nine days after his conviction, which is only nine days beyond the ninety-day period provided by the rule. Thus, Williams' final issue warrants no relief.

Having found no merit to any of Williams' issues, we affirm his judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 5/27/21